IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

FISHER SAND & GRAVEL CO.
d/b/a SOUTHWEST ASPHALT PAVING and
FISHER SAND & GRAVEL – NEW MEXICO, INC.,

      Plaintiff,

vs.                                                                                                No. 10-cv-0635 RB/SMV

FNF CONSTRUCTION, INC.,
PULICE CONSTRUCTION, INC.,
GARY GIRÓN, individually and as Cabinet Secretary
of the New Mexico Department of Transportation,
MAX VALERIO, individually and as Deputy Secretary
of the New Mexico Department of Transportation,
JED BILLINGS, Chief Executive Officer
of FNF Construction, Inc., and
STEPHEN BASILA, President of Pulice Construction, Inc.,

      Defendants.

**MEMORANDUM OPINION AND ORDER
DENYING MOTION TO DISMISS NO. 1**

      This case arises out of construction bidding processes in New Mexico and Arizona. After submitting bids, Defendant FNF Construction, Inc. ("FNF") and Pulice Construction, Inc. ("Pulice") allegedly contacted government officials in New Mexico and Arizona and provided information about the supposed criminal activities of Plaintiff Fisher Sand & Gravel, Co. ("Fisher"), d/b/a Southwest Asphalt Paving and Fisher Sand & Gravel – New Mexico, Inc. FNF has filed several motions to dismiss, which the Court will address in turn. FNF first asserts that this case should be dismissed because the conduct underlying all of Fisher's claims consists of statements to government officials about a public figure; as such, FNF is protected from liability under the *Noerr-Pennington* doctrine and the First Amendment. (Doc. 88). Having considered

the submissions of counsel, relevant law, and otherwise being fully advised, the Court **DENIES** FNF's Motion to Dismiss No. 1.

## I. Standard

Federal Rule of Civil Procedure 12(b)(6) authorizes a court to dismiss a complaint in whole or in part for failing to state a claim upon which relief is available. To survive a Rule 12(b)(6) motion to dismiss, a complaint must state a claim for relief that plausibly, not merely possibly, entitles the plaintiff to relief under the relevant law. *Robbins v. Oklahoma*, 519 F.3d 1242, 1247 (10th Cir. 2008) (citation omitted). In considering a motion to dismiss, the court must look within the four corners of the complaint and accept all well-pleaded factual allegations as true. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)); *Christy Sports, LLC v. Deer Valley Resort Co., Ltd.*, 555 F.3d 1188, 1191 (10th Cir. 2009) (citations omitted); *Issa v. Comp USA*, 354 F.3d 1174, 1177 (10th Cir. 2003) (citation omitted). However, the court need not accept legal conclusions contained in the complaint as true. *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 555).

## II. Background

The following factual summary is drawn from the facts as pleaded by Fisher. This case arises out of the bidding process for two separate road construction projects.[1] Fisher, Pulice, and FNF submitted bids for the Arizona project in May of 2009; around that same time, Fisher and FNF submitted bids for the Las Cruces project. (Verified Am. Compl. ("Compl."), Doc. 81, at ¶¶ 29, 31). For both projects, Fisher was the low bidder. (Compl. at ¶¶ 30, 32). While the bids were under consideration, continuing through the present, FNF and Pulice engaged in a "coordinated effort" to drive Fisher out of the New Mexico and Arizona road construction markets by

---

[1] Though Fisher discusses some alleged unlawful conduct in regard to a third project, the Harding County Project, those allegations are not relevant to FNF's motion.

initiating bid protests and making statements to government officials challenging Fisher's status as a responsible bidder. (Compl. at ¶ 37-39, 59). These efforts by FNF and Pulice included intentionally misrepresenting Fisher's financial condition and business practices as well as the status of federal criminal proceedings against Fisher. (Compl. at ¶¶ 40-42, 44).

In 2008, Fisher and three of its former officers were indicted for tax fraud involving the improper allocation of personal expenses as business expenses. (Compl. at ¶ 45). On May 5, 2009, Fisher entered a Deferred Prosecution Agreement ("DPA"), in which it accepted responsibility for the fraudulent conduct and agreed to pay restitution and take remedial measures. (Compl. at ¶ 49; DPA, Doc. 81-1 Ex. A). The DPA was approved by the court on May 5, 2009. (6/8/09 Letter from Timothy Priebe to ADOT, Doc. 81-1 Ex. B). Fisher advised the Arizona Department of Transportation ("ADOT") of the DPA in person and by letter dated June 8, 2009. (Compl. at ¶ 51; 6/8/09 Priebe Letter). Fisher disclosed the DPA to the New Mexico Department of Transportation ("NMDOT") on May 29, 2009. (Compl. at ¶ 52). The DPA was also reported in a North Dakota newspaper on May 29, 2009. (Compl. at ¶ 73; 5/29/09 Jamestown Sun Article, Doc. 81-1 Ex. 2). Fisher does not dispute FNF's statement that the bids available for public inspection did not contain information about the DPA. (*See* Doc. 89 at 3).

After learning of the DPA, FNF and Pulice conferred and agreed to challenge Fisher's status as a responsible bidder in New Mexico and Arizona. (Compl. at ¶¶ 53-54). Thereafter, on June 9, 2009, Pulice filed a bid protest in Arizona. (Compl. at ¶¶ 64). However, by that time, the deadline for bid protests had passed. (Compl. at ¶¶ 57, 64, 71). Pulice supplemented its protest on June 17 and 18, 2009. (Compl. at ¶ 75). In the protest, Pulice stated that Fisher was still under criminal investigation, federal officials would review a decision awarding a contract to Fisher, and awarding a contract to Fisher would violate federal regulations. (Compl. at ¶ 85). Fisher

alleges that this bid protest was filed in bad faith and that the statements included therein were false. (Compl. at ¶¶ 70, 86-89). As a result of the bid protest, an ADOT representative held a public hearing and determined that the protest was untimely and Fisher's bid was responsive. (Compl. at ¶¶ 89-91). On the day of the public hearing, representatives of FNF and Pulice made a baseless oral statement to the ADOT representative calling Fisher's financial stability into question. (Compl. at ¶ 92). Ultimately, ADOT awarded the Arizona project contract to Fisher. (Compl. at ¶ 95).

Beginning June 22, 2009, four days after NMDOT recommended that the Las Cruces project be awarded to Fisher, through July 22, 2009, FNF engaged in written and telephonic communications with NMDOT regarding Fisher and the DPA. (Compl. at ¶¶ 106, 110, 114-119, 122). FNF never submitted an official bid protest, though Fisher posits that FNF's actions constituted a de facto bid protest. (Compl. at ¶ 110). In the course of the ex parte communications between FNF and NMDOT, which violated the New Mexico Procurement Code, FNF made false statements regarding Fisher including that Fisher was recently convicted of a crime. (Compl. at ¶ 113). Additionally, FNF threatened litigation against NMDOT if NMDOT in fact awarded the contract to Fisher. (*Id.*) On July 24, 2009, FNF's counsel, Josh Grabel, made an oral statement to attorneys for NMDOT that impugned Fisher's financial stability or business ethics. (Compl. at ¶¶ 225-227). On July 28, 2009, NMDOT decided to reject all bids and issue a new request for proposals on the Las Cruces project. (Compl. at ¶¶ 133, 136). This decision was published in the Las Cruces Sun-News, though the article did not mention any details of the original bidding process. (Compl. at ¶ 137; 8/3/09 Sun-News Article, Doc. 81-4 Ex. N). After the second round of bidding, NMDOT awarded the contract to an unrelated party. (Compl. at ¶ 146).

In April of 2010, Fisher received notice that ADOT intended to conduct a "responsibility hearing" to determine whether it was a responsible bidder under the relevant portion of the Arizona Code. (Compl. at ¶ 34, 157). While ADOT was contemplating the hearing, on June 11, 2010, FNF's Chief Executive Officer, Jed Billings, sent an ex parte e-mail to an ADOT engineer containing false information. (Compl. at ¶ 35, 159). In the e-mail, Billings stated that Fisher failed to file required notifications regarding an asphalt mixing facility that it owned, though such notifications would only be required if the facility was located on a flood plain and Billings knew that the facility was not situated on a flood plain. (Compl. at ¶¶ 160, 212). The hearing was ultimately conducted by the Arizona State Transportation Board, and Fisher was deemed a responsible contractor. (Compl. at ¶ 161).

Following the aforementioned events, Fisher brought suit in New Mexico State Court against NMDOT and NMDOT Cabinet Secretary Gary Girón based on NMDOT's actions in rejecting the initial bids on the Las Cruces project. *See Fisher Sand & Gravel-N.M., Inc. v. N.M. Dep't of Transp.*, No. D-101-CV-200902606. FNF, Pulice, and their representatives are not parties to that action. District Judge Sarah M. Singleton has determined that NMDOT violated the New Mexico Procurement Code by communicating ex parte with FNF regarding Fisher's responsibility and qualifications. (Am. Mem. Op., Doc. 102 Ex. 1, at 4-8). The case remains open as the appropriate remedy has yet to be determined. (*Id.* at 18).

Fisher filed the instant action in this Court on July 6, 2010. Fisher raises eleven claims against the defendants, charging: (1) civil conspiracy by FNF, Billings, Pulice and Basila; (2) defamation by FNF, Billings, Pulice and Basila based on statements to ADOT that Fisher was financially insolvent; (3) defamation by Pulice based on representations that Fisher was under criminal investigation; (4) defamation by FNF and Billings based on the de facto bid protest

5

made to NMDOT; (5) injurious falsehood by FNF, Pulice, Billings and Basila in relation to false allegations in the Arizona bid protest; (6) injurious falsehood by FNF based on statements to NMDOT related to Fisher's financial stability, business ethics, and/or pending bid protest in Nevada; (7) tortious interference with prospective and existing contractual relations by FNF and Valerio based on the rejection of bids for the Las Cruces project;[2] (8) in the alternative, prima facie tort by FNF based on the rejection of bids for the Las Cruces project; (9) a violation of 42 U.S.C. § 1983 by FNF, Girón and Valerio based on action under color of law to violate the requirements of the Procurement Code and deprive Fisher of a liberty or property interest in the Las Cruces and Harding County projects; (10) a violation of the Racketeer Influenced Corrupt Organization Act ("RICO"), 18 U.S.C. § 1962(c) and (d), by FNF, Billings, Pulice and Basila based on the alleged scheme to drive Fisher out of construction markets; and (11) a violation of New Mexico's Unfair Trade Practices Act, N.M. STAT. ANN. § 57-12-1 *et seq.*, by FNF and Billings based on the false, misleading and disparaging information they provided to NMDOT. Fisher seeks compensatory and punitive damages, attorneys' fees and costs. Fisher also seeks injunctive relief against Girón and Valerio in their official capacities prohibiting them from participating in future decisions involving bids submitted by Fisher and its affiliates. Under the RICO claim, Fisher requests actual damages plus treble damages, punitive damages, attorneys' fees and costs. Finally, pursuant to its Unfair Trade Practices Act claim, Fisher requests injunctive relief, three times the proven damages, attorneys' fees, interest and costs.

In its Motion to Dismiss No. 1, FNF asserts that it is immune from liability for claims based solely on communications to government officials under the *Noerr-Pennington* doctrine. (Doc. 89 at 2). In addition, FNF argues that Fisher is a limited-purpose public figure and, as a

---

[2] Fisher states that this claim against Valerio is retained solely for purposes of preserving the issue for appeal. (Compl. at 50 n.4).

result, any claims based on speech against Fisher may only be brought if actual malice is shown. (*Id.*) FNF contends that Fisher has failed to satisfy this rigorous standard. (*Id.*) Fisher opposes the motion in its entirety, raising several arguments to counter the applicability of the *Noerr-Pennington* doctrine and the public figure standard. (Doc. 102).

### III.     Applicability of *Noerr-Pennington*

The Supreme Court has recognized the First Amendment right to petition the Government for a redress of grievances as one of "the most precious of the liberties safeguarded by the Bill of Rights . . . ." *BE & K Const. Co. v. NLRB*, 536 U.S. 516, 522 (2002) (quoting *United Mine Workers of Am., Dist. 12 v. Ill. State Bar Ass'n*, 389 U.S. 217, 222 (1967)). In the context of antitrust law, the Supreme Court developed a doctrine, now called the *Noerr-Pennington* doctrine, shielding "from the Sherman Act a concerted effort to influence public officials regardless of intent or purpose." *United Mine Workers of Am. v. Pennington*, 381 U.S. 657, 670 (1965).

The Supreme Court initially recognized this doctrine in *E. R.R. Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127 (1961). The case involved an antitrust suit by long distance trucking companies based on the railroad industry's publicity campaign aimed at changing state law to restrict the trucking business. The Court held that "the Sherman Act does not apply to the activities of the railroads at least insofar as those activities comprised mere solicitation of governmental action with respect to the passage and enforcement of laws." *Id.* at 138. The Court based its determination on a statutory interpretation of the Sherman Act, which it held was not meant to regulate politics and governmental action that operates to restrain trade. *Id.* at 136-37. The Court also stated that interpreting the Sherman Act to prohibit companies from seeking favorable legislation would raise constitutional questions in that it could conflict with the

7

right to petition. *Id.* at 137-38. Following *Noerr*, the Court has made clear that the same immunity from Sherman Act liability applies to attempts to influence any department of the Government, including administrative agencies and the courts. *BE & K*, 536 U.S. at 525 (quotation omitted); *Cal. Motor Transport Co. v. Trucking Unlimited*, 404 U.S. 508, 510 (1972) (citations omitted).

The Court has, by analogy, applied the principles of *Noerr-Pennington* outside the antitrust context. Specifically, in determining the contours of the right to petition under the National Labor Relations Act ("NLRA"), the Court has analogized to the antitrust context. *See BE & K*, 536 U.S. at 528-33; *Bill Johnson's Rests., Inc. v. NLRB*, 461 U.S. 731, 733-34 (1983). However, the Court has not held that *Noerr-Pennington* applies to the NLRA; instead, the Court has merely sought guidance from *Noerr-Pennington* in combination with analyzing the specific burden the NLRA places on petitioning. *See BE & K*, 536 U.S. at 529.

Other circuits have applied *Noerr-Pennington* widely outside the antitrust context. *See, e.g.*, *Bayou Fleet, Inc. v. Alexander*, 234 F.3d 852, 859 (5th Cir. 2000) (citation omitted) ("Although the Supreme Court has limited its discussion of *Noerr-Pennington* immunity to cases involving antitrust litigation, this Court has extended the *Noerr-Pennington* doctrine to include claims under section 1983."); *We, Inc. v. City of Philadelphia*, 174 F.3d 322, 326-27 (3d Cir. 1999) (explaining that the Third Circuit "has by analogy extended the *Noerr-Pennington* doctrine to offer protection to citizens' petitioning activities in contexts outside the antitrust area . . . ."). However, the Tenth Circuit has not. The parties suggest that the applicability of *Noerr-Pennington* outside the antitrust arena is an open issue in the Tenth Circuit (Doc. 102 at 5-7; Doc. 138 at 5), but the Court does not agree. The Tenth Circuit has clearly stated its position on this issue in an en banc opinion: "In our view, it is more appropriate to refer to immunity as

8

*Noerr-Pennington* immunity only when applied to antitrust claims. In all other contexts, . . . such immunity derives from the right to petition." *Cardtoons, L.C. v. Major League Baseball Players Ass'n*, 208 F.3d 885, 889-90 (10th Cir. 2000); *see also Pers. Dep't, Inc. v. Prof'l Staff Leasing Corp.*, 297 F. App'x 773, 778-79 (10th Cir. 2008) (unpublished); *Scott v. Hern*, 216 F.3d 897, 913-14 (10th Cir. 2000).

In *Cardtoons*, the Tenth Circuit described the development of *Noerr-Pennington* as encompassing both a statutory interpretation of the Sherman Act and the First Amendment right to petition. *Id.* at 888-89. Accordingly, while the Supreme Court and other circuits have discussed the application of *Noerr-Pennington* outside the antitrust context, they have done so solely on the basis of the right to petition. *Id.* at 889 (citing *Bill Johnson's*, 461 U.S. at 742-43; *NAACP v. Claiborne Hardware*, 458 U.S. 886, 913-14 (1982)). In a statement entirely applicable to the issue at hand, the Tenth Circuit unequivocally stated, "These cases, founded in part upon a construction of the Sherman Act, are not completely interchangeable with cases based solely upon the right to petition." *Id.* at 890.

The parties suggest that this issue is open because a Tenth Circuit panel in an unpublished decision stated that this circuit exercises caution when applying "*Noerr-Pennington* immunity to cases outside the antitrust context . . . ." *Pers. Dep't, Inc.*, 297 F. App'x at 778-79 (citing *Scott*, 216 F.3d at 914). However, the *Pers. Dep't, Inc.* decision was unpublished and carries no precedential effect. 10th Cir. R. 32.1(A). Additionally, the quoted language is drawn from *Scott*, in which the Tenth Circuit stated that "care must be taken when drawing right to petition principles from *Noerr-Pennington* antitrust cases." 216 F.3d at 914. Within this circuit, First Amendment principles may be drawn from cases applying *Noerr-Pennington* but, outside the realm of antitrust, the true defense arises under the right to petition.

9

The Court must also address the suggestion that *Cardtoons*' discussion of *Noerr-Pennington* constituted mere dicta. In *Cardtoons*, the plaintiff claimed that the defendant committed libel and prima facie tort by sending a cease and desist letter to a private party that included a threat of litigation. 208 F.3d at 886-87. The defendant attempted to invoke immunity under *Noerr-Pennington*, relying on a Fifth Circuit case that held that *Noerr-Pennington* applies to prelitigation threats to sue directed toward a private party in the antitrust context. *See id.* at 890-91 (discussing *Coastal States Mktg., Inc. v. Hunt*, 694 F.2d 1358 (5th Cir. 1983)). In rejecting the applicability of *Noerr-Pennington* outside the antitrust context, the court distinguished the facts of *Cardtoons* from the Fifth Circuit case. *Id.* After making that distinction, the court proceeded to analyze the facts under the framework for immunity under the right to petition, set forth in *McDonald v. Smith*, 472 U.S. 479 (1985). *Cardtoons*, 208 F.3d at 891-93. Ultimately, the court concluded that the defendant's actions did not constitute a petition to the government and so did not fall under the ambit of the petition clause. *Id.* at 892-93. It is clear that the Tenth Circuit's determination that *Noerr-Pennington* does not directly apply outside the antitrust context was not merely dicta; consequently, this Court must find FNF's invocation of *Noerr-Pennington* immunity unavailing.

Consistent with the Tenth Circuit's precedent, FNF's true defense arises under the right to petition. Certainly, FNF is entitled to plead and prove that it is immune from liability pursuant to the petition clause, but it has not done so. The *Noerr-Pennington* doctrine is not interchangeable with the right to petition, as FNF suggests, and this Court will not blithely apply *Noerr-Pennington* principles to the facts of this case. Because FNF's motion is brought pursuant to *Noerr-Pennington* rather than the right to petition, the Court denies the motion.

### IV. Fisher's Status as a Public Figure

The First Amendment circumscribes liability for actions based on a party's statements. *See N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 283 (1964). When the plaintiff is a public figure, in order to state a claim for defamation, it must demonstrate by a standard of clear and convincing evidence that the defamatory statement was made with "actual malice." *See Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496, 510 (1991) (citation omitted). Actual malice is defined as "knowledge that [the statement] was false or with reckless disregard of whether it was false or not." *N.Y. Times*, 376 U.S. at 280.

The same rigorous standard applies when the plaintiff is a "limited-purpose public figure." *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 246, 246 n.3 (1986). In contrast to public figures, who "have assumed roles of especial prominence in the affairs of society" or "occupy positions of . . . persuasive power and influence[,]" limited-purpose public figures are only public figures with respect to a specific issue. *See Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 345 (1974). Indeed, the Supreme Court has defined a limited-purpose public figure as one who "voluntarily injects himself or is drawn into a particular public controversy and thereby becomes a public figure for a limited range of issues." *See Liberty Lobby*, 477 U.S. at 246 n.3 (quotation omitted). In other words, limited-purpose public figures are those who "thrust themselves to the forefront of particular public controversies in order to influence the resolution of the issues involved." *Gertz*, 418 U.S. at 345. The determination of whether a party is a limited-purpose public figure is a question of law. *World Wide Ass'n of Specialty Programs v. PURE, Inc.*, 450 F.3d 1132, 1137 (10th Cir. 2006) (citations omitted).

Federal courts presiding over state defamation claims look to state law in order to determine whether a party is a public figure. *See id.* at 1136-37. In New Mexico, the courts have

11

set out a two-step inquiry: (1) "whether the defamatory material concerns a public controversy or topic of legitimate public concern[;]" and (2) "the nature and extent of [the person's] participation in the controversy." *Furgason v. Clausen*, 785 P.2d 242, 249 (N.M. Ct. App. 1989). Accordingly, the first question that the Court must address is whether a public controversy gave rise to the allegedly defamatory statements. A "public controversy" does not encompass every issue that is conceivably of interest to the public. *Time, Inc. v. Firestone*, 424 U.S. 448, 454 (1976). "Rather, 'public controversy' is a legal term of art; the term only encompasses a dispute 'that in fact has received public attention because its ramifications will be felt by persons who are not direct participants.'" *Carr v. Forbes, Inc.*, 259 F.3d 273, 279 (4th Cir. 2001) (quoting *Foretich v. Capital Cities/ABC, Inc.*, 37 F.3d 1541, 1554 (4th Cir. 1994)); *see also Little v. Breland*, 93 F.3d 755, 757 (11th Cir. 1996) (quoting *Silvester v. Am. Broad. Co., Inc.*, 839 F.2d 1491, 1495 (11th Cir. 1988)).

FNF has failed to even set forth argument as to whether its ex parte communications with ADOT and NMDOT concerned a public controversy. In its reply brief, FNF seems to recognize its error, asserting that there was a controversy "over whether a major public road contract involving tens of millions of dollars in state and federal funds should be awarded to a contractor that had been under indictment for . . . a long-running pattern of willful tax fraud." (Doc. 138 at 6). However, FNF has presented no evidence supporting its bald assertion that the contracts at issue and Fisher's indictment for tax fraud were public controversies. The Court has found no case in which the party seeking to invoke this First Amendment defense presented no evidence that a matter was one of public controversy or concern. *See PURE, Inc.*, 450 F.3d at 1137; *DeVaney v. Thriftway Mktg. Corp.*, 953 P.2d 277 (N.M. 1997) (overruled on other grounds by

*Durham v. Guest*, 204 P.3d 19 (N.M. 2009)). Similarly, the Court has found no case suggesting that all publicly bid contracts automatically constitute matters of public controversy and concern.

Because FNF failed to demonstrate that a public controversy in fact existed, the Court cannot dismiss Fisher's claims against FNF on First Amendment grounds. Because no public controversy has been identified or established, the Court does not reach the nature and extent of Fisher's participation in the controversy or the sufficiency of Fisher's pleading. FNF's motion to dismiss Fisher's claims based on Fisher's status as a public figure is denied.

**THEREFORE,**

**IT IS ORDERED** that FNF's Motion to Dismiss No. 1, filed July 2, 2012 (Doc. 88), is **DENIED**.

_____
**ROBERT C. BRACK**
**UNITED STATES DISTRICT JUDGE**