# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

FISHER SAND & GRAVEL CO.
d/b/a SOUTHWEST ASPHALT PAVING and
FISHER SAND & GRAVEL – NEW MEXICO, INC.,

        Plaintiff,

vs.                                  No. 10-cv-0635 RB/SMV

FNF CONSTRUCTION, INC.,
PULICE CONSTRUCTION, INC.,
GARY GIRÓN, individually and as Cabinet Secretary
of the New Mexico Department of Transportation,
MAX VALERIO, individually and as Deputy Secretary
of the New Mexico Department of Transportation,
JED BILLINGS, Chief Executive Officer
of FNF Construction, Inc., and
STEPHEN BASILA, President of Pulice Construction, Inc.,

        Defendants.

## MEMORANDUM OPINION AND ORDER GRANTING IN PART
## AND DENYING IN PART MOTION TO DISMISS NO. 3

This case arises out of construction bidding processes in New Mexico and Arizona. After submitting bids, Defendant FNF Construction, Inc. ("FNF") and Pulice Construction, Inc. ("Pulice") allegedly contacted government officials in New Mexico and Arizona and provided information about Plaintiff Fisher Sand & Gravel, Co. ("Fisher"), d/b/a Southwest Asphalt Paving and Fisher Sand & Gravel – New Mexico, Inc. in an effort to exclude Fisher from the construction market. FNF has filed several motions to dismiss, which the Court will address in turn. FNF's third motion argues that Fisher fails to state a claim under any common law doctrine. (Doc. 93). Having considered the submissions of counsel, relevant law, and otherwise being fully advised, the Court **GRANTS IN PART** and **DENIES IN PART** FNF's Motion to Dismiss No. 3.

## I.      Standard

Federal Rule of Civil Procedure 12(b)(6) authorizes a court to dismiss a complaint in whole or in part for failing to state a claim upon which relief is available. To survive a Rule 12(b)(6) motion to dismiss, a complaint must state a claim for relief that plausibly, not merely possibly, entitles the plaintiff to relief under the relevant law. *Robbins v. Oklahoma*, 519 F.3d 1242, 1247 (10th Cir. 2008) (citation omitted). In considering a motion to dismiss, the court must look within the four corners of the complaint and accept all well-pleaded factual allegations as true. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)); *Christy Sports, LLC v. Deer Valley Resort Co., Ltd.*, 555 F.3d 1188, 1191 (10th Cir. 2009) (citations omitted); *Issa v. Comp USA*, 354 F.3d 1174, 1177 (10th Cir. 2003) (citation omitted). However, the court need not accept legal conclusions contained in the complaint as true. *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 555).

Generally, courts considering Rule 12(b)(6) motions must confine their review to the complaint and other pleadings; if the parties present matters outside the pleadings for the court's consideration, the motion may be converted to one for summary judgment. Fed. R. Civ. P. 12(d). However, there are some exceptions. A court may consider documents attached to a plaintiff's complaint on a motion to dismiss without converting it. *See* Fed. R. Civ. P. 10(c).

## II.     Background

The Court provided a detailed factual summary in its Memorandum Opinion and Order Denying FNF's Motion to Dismiss No. 1, and that background is incorporated herein by reference. However, some additional detail is necessary to address the arguments in FNF's Motion to Dismiss No. 3. The following additional facts are drawn from the facts as pleaded by Fisher and the supporting documents attached to Fisher's Verified Amended Complaint.

As the Court has described, this case arises out of the bidding process for two separate road construction projects, one in Arizona (the "Arizona project") and one in New Mexico (the "Las Cruces project"). (*See* Verified Am. Compl. ("Compl."), Doc. 81). Fisher, Pulice, and FNF are competing construction companies. However, according to Fisher, Pulice and FNF agreed to work together in order to exclude Fisher from the construction markets in the states of New Mexico and Arizona by challenging the company's status as a responsible bidder. As a result of their efforts, the New Mexico Department of Transportation ("NMDOT") rejected all bids for the Las Cruces project, causing Fisher to lose that contract. Additionally, NMDOT cancelled a project, the Harding County project, purportedly due to insufficient funds after having awarding the contract to Fisher. (Compl. at ¶¶ 151-54).

Pulice and FNF entered the agreement to challenge Fisher's status after they became aware that Fisher and some of its former officers had been indicted for tax fraud and that Fisher had entered a Deferred Prosecution Agreement ("DPA") to resolve the charges against it. Pursuant to the DPA, Fisher was required to accept responsibility for violating the law, including admitting that for the 2001-2004 tax years it caused the personal expenses of Michael Fisher and other Fisher family members to be paid by Fisher, concealed the nature of these expenses, provided false and inaccurate records and statements to outside accountants, and willfully filed false corporate tax returns. (DPA, Doc. 81-1 Ex. A, at ¶ 4). Fisher agreed to pay a large sum of money and to draft and implement a Code of Business Ethics and Conduct. (*Id.* at ¶¶ 7, 18-20). In consideration for Fisher entering the DPA, the Government agreed to recommend that Fisher's prosecution be deferred until December 31, 2011. (*Id.* at ¶ 22). The Government agreed to seek dismissal of the indictment with prejudice as to Fisher after January 30, 2012. (*Id.* at ¶ 23). Were the Government to determine that Fisher had breached any provision of the DPA, all statements

set forth in the DPA and the acceptance of responsibility would have been admissible against Fisher in the prosecution. (*Id.* at ¶ 28).

As part of the alleged conspiracy, FNF, its Chief Executive Officer, Jed Billings, and its attorney, Josh Grabel, made a number of statements and submissions to NMDOT and the Arizona Department of Transportation ("ADOT"). On June 22, 2009, Billings sent an e-mail message to Max Valerio, Deputy Secretary of NMDOT. In the e-mail, Billings indicated that he was forwarding all documentation that FNF had regarding Pulice's protest of Fisher's ADOT bid. It further stated that Fisher would need to submit "a detailed letter explaining their indictment and most recent conviction." (6/22/09 E-mail, Subject: ADOT Bid Protest, Doc. 81-4 Ex. K at 1).

On June 25, 2009, Grabel sent a letter, via e-mail, to David Coriz and Germaine Chappelle, General Counsel to NMDOT, styled as a public records request related to the Las Cruces project. (6/25/09 Public Records Request, Doc. 81-4 Ex. L, at 1-3). In the letter, Grabel stated that FNF intends to file a bid protest against a proposed award of the contract to Fisher because, based on "Fisher's now admitted consistent and repeated illegal and unethical conduct, as evidenced by the indictment and eventual entering of a Deferred Prosecution Agreement[,]" awarding it a contract that included federal dollars would be inappropriate. (*Id.* at 2).

On July 22, 2009, Grabel sent a letter to Chappelle regarding alleged misrepresentations by Fisher in a prior project.[1] (7/22/09 Letter re: Fisher Sand & Gravel's Misrepresentations, Doc. 81-4 Ex. M, at 1-11). In that letter, FNF provided "a summary of the issues related to the . . . I-40 Project . . . in which Fisher . . . prevailed in a bid protest against FNF by making representations to NMDOT . . . that were either untrue, incomplete or misleading." (*Id.* at 1). Over three pages,

---

[1] Fisher's response clarifies that this letter is what it referred to in alleging that Grabel shared with Chappelle and Daniel Gershon, also of NMDOT, information that "falsely impugned Fisher NM's financial stability and/or Fisher NM's business ethics." (Compl. at ¶¶ 131, 225-26; Doc. 104 at 7-8).

Grabel described two representations that Fisher made and the reasons that FNF considered them to be misrepresentations. (*Id.* at 1-3). Grabel concluded the letter by stating that FNF did not seek NMDOT's reconsideration of the bid protest on the I-40 project, but that "NMDOT now knows that those misrepresentations were, just like Fisher's 2001 through 2004 tax returns, false statements." (*Id.* at 3). Grabel then suggested that NMDOT consider "these facts in deciding whether it wants to continue 'partnering' with a contractor who is unwilling to disclose the full truth to NMDOT." (*Id.*) Grabel attached two letters that Fisher sent to NMDOT in connection with the I-40 project on which he based some of his assertions in the letter. (*Id.* at 4-11). That same day, Grabel sent two e-mails to Gershon and Chappelle about a bid protest against Fisher that was pending in Nevada. (Compl. at ¶¶ 131, 227).

Based on these communications and alleged harm resulting therefrom, Fisher brought the instant lawsuit in July of 2010. At the time that Fisher brought this case, a lawsuit regarding the NMDOT contracts was ongoing in state court, filed by Fisher against NMDOT and NMDOT Cabinet Secretary Gary Girón. *See Fisher Sand & Gravel-N.M., Inc. v. N.M. Dep't of Transp.*, No. D-101-CV-200902606. That matter was based on NMDOT's actions in cancelling and rebidding the Las Cruces project as well as in cancelling the Harding County project due to insufficient funds. In that matter, New Mexico District Judge Sarah Singleton concluded that NMDOT's ex parte communications with FNF and Billings in relation to the award of the Las Cruces project violated the New Mexico Procurement Code. (Am. Mem. Op., Doc. 81 Ex. P at 7-8). Judge Singleton also found nothing unlawful regarding NMDOT's decision to cancel the Harding County project prior to executing the contract with Fisher. (*Id.* at 11).

At issue in the instant motion are Fisher's claims against FNF for civil conspiracy, defamation, injurious falsehood, tortious interference with prospective and existing contractual

5

relations, and prima facie tort. FNF asserts that none of these claims are viable because none of FNF's statements were false. (Doc. 94 at 2-10). FNF also raises arguments specific to each claim, contending that Fisher fails to state a claim upon which relief may be granted. (Doc. 94 at 10-23). Fisher opposes the motion in its entirety. (Doc. 104).

### III.  Defamation

Fisher claims that FNF and Billings committed defamation by making the following statements in the course of the de facto bid protest with NMDOT: (1) Fisher was not responsible and NMDOT may not want to continue partnering with it; (2) Fisher had been convicted of a crime; (3) Fisher had engaged in "consistent and repeated illegal and unethical conduct[;]" and (4) Fisher made misrepresentations in its pricing on the earlier I-40 project and inquiring whether NMDOT wants to continue partnering with a contractor "who is unwilling to disclose the full truth to NMDOT." (Compl. at ¶¶ 202-204). Fisher contends that these statements imputed criminal behavior, lack of integrity, and unfitness to perform the duties of the Las Cruces project. (*Id.* at ¶ 211). Fisher also takes issue with a statement by Billings to ADOT that an asphalt mixing facility owned by Fisher was required to file certain notifications with ADOT and failed to do so.[2] (*Id.* at ¶ 212).

FNF contends that none of the statements cited by Fisher in its complaint were false and, consequently, none give rise to liability in defamation or any other cause of action. (Doc. 94 at 2, 13-14). To address this contention, the Court will take each statement in turn after providing an overview of the relevant law. The Court applies the law of New Mexico in determining whether FNF's statements made in this state were defamatory. In New Mexico, whether a statement is susceptible to a defamatory meaning is a question of law. *Moore v. Sun Pub. Corp.*, 881 P.2d 735, 740 (N.M. Ct. App. 1994) (citation omitted).

---

[2] FNF does not address this statement in its motion.

6

Truth is a complete defense to a defamation claim. *Jaramillo v. Gonzales*, 50 P.3d 554, 562-63 (N.M. Ct. App. 2002) (citing *Newberry v. Allied Stores, Inc.*, 773 P.2d 1231, 1237 (N.M. 1989)). This defense applies when the statement is literally true or substantially true, meaning that the statement is true in all material respects. N.M. UNIFORM JURY INSTRUCTIONS (Civil) § 13-1013. Accordingly, even if the statement includes slight inaccuracies, no defamation claim will lie so long as the substance of the statement is true. *Coronado Credit Union v. KOAT Television, Inc.*, 656 P.2d 896, 900-01 (N.M. Ct. App. 1982) (quoting *Franklin v. Blank*, 525 P.2d 945, 948 (N.M. Ct. App. 1974)). However, a statement may be characterized as defamatory if it produces a different effect on the mind of the listener that that which the truth would have produced. *Schwartz v. Am. Coll. of Emergency Physicians*, 215 F.3d 1140, 1146 (10th Cir. 2000) (quoting *Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496, 517 (1991)).

Similarly, statements of opinion are generally not actionable pursuant to a defamation claim. *Marchiondo v. Brown*, 649 P.2d 462, 472 (N.M. 1982) (citations omitted); *see also* N.M. UNIFORM JURY INSTRUCTIONS (Civil) § 13-1004. In New Mexico, verifiability is the controlling element to determine whether a statement is fact or opinion, and a statement qualifies as one of opinion if it cannot be proved or disproved. *Moore*, 881 P.2d at 742 (citations omitted). Even a verifiable statement may qualify as one of opinion if the speaker fully discloses the facts upon which the opinion is based, thereby allowing the reader to form his own opinion. *Marchiondo*, 649 P.2d at 472 (quotation omitted). However, if the statement implies that the writer has private knowledge substantiating his comment, thereby implying the existence of defamatory facts, the statement is actionable in defamation. *Id.* (quotation omitted); *see also* RESTATEMENT (SECOND) OF TORTS § 566 (1977).

A. *Characterization of the DPA as a Conviction*

FNF argues that Billings' characterization of the DPA as a conviction was a substantially true statement. (Doc. 94 at 3). It asserts that at most the statement was a technical error in legal terminology that merely communicated that Fisher had engaged in criminal behavior. According to Fisher's complaint, Billings' characterization of the DPA as a conviction "imputed criminal behavior to Fisher . . . ." (Compl. at ¶ 211). However, in the DPA, Fisher did admit to criminal behavior. According to FNF, no significant additional harm was suffered by Fisher as a result of Billings' use of the word conviction. (Doc. 94 at 4). Fisher, on the other hand, asserts that Billings' description of the DPA as a conviction implied that Fisher falsely certified that it had not been convicted of a crime. (Doc. 104 at 4). Thus, the effect on the mind of the reader was different.

In the context of the bidding process, the word conviction triggers a host of potential negative consequences. For example, if a bidder has been convicted of a crime, NMDOT may debar or suspend a bidder pursuant to the Procurement Code. N.M. STAT. ANN. § 13-1-178(A)-(C). Though the characterization of the DPA as a conviction could be characterized as a technical error in legal terminology in some cases, the factual circumstances of this case are different. Here, whether or not Fisher had a criminal conviction would have made a real and significant difference to NMDOT. The term "conviction" would clearly have a different impact on NMDOT officials than the phrase "criminal conduct admitted in the DPA."

Furthermore, the DPA that Fisher entered was not the functional equivalent of a conviction. Under the DPA, Fisher retained the right to plead not guilty and proceed to trial. The language of the DPA carefully distinguished it from a determination of guilt as to the charged offenses, and Fisher was diverted out of the judicial process before guilt was established.

Consequently, the facts of this case are distinguishable from the cases cited by FNF. *See Harmon v. Teamsters, Chauffeurs & Helpers Local Union 371*, 832 F.2d 976, 977, 979-80 (7th Cir. 1987) (deferred judgment, which required guilty plea, was conviction); *Garcia v. State Bd. of Educ.*, 694 P.2d 1371, 1374 (N.M. Ct. App. 1984) (focus on establishment of guilt). Given the factual circumstances surrounding Billings' use of the term "conviction," the Court cannot conclude that this statement was not defamatory.

### B.  Statement in Public Records Request

FNF asserts that Grabel's statement in FNF's public records request regarding Fisher's "now admitted consistent and repeated illegal and unethical conduct" is a truthful statement as it relates to Fisher's illegal conduct and opinion as it pertains to Fisher's unethical conduct. (Doc. 94 at 5). The truth of Grabel's statement is demonstrated by the DPA, in which Fisher admits that, over the course of four years, it engaged in tax fraud.

Fisher does not dispute the veracity of Grabel's statement regarding Fisher's consistent and repeated illegal conduct; Fisher merely takes issue with Grabel's characterization of its conduct as unethical. (Doc. 104 at 6). It does not take much of a stretch to conclude that the entirety of Grabel's statement was substantially true. It would be difficult to describe illegal conduct as ethical. Nevertheless, whether or not an act is ethical is not subject to objective verification, and a non-verifiable statement qualifies as opinion. *See, e.g.*, *Cummins v. SunTrust Capital Markets, Inc.*, 416 F. App'x 101, 103-04 (2d Cir. 2011) (unpublished) ("unethical" is non-actionable opinion); *Redco Corp. v. CBS, Inc.*, 758 F.2d 970, 972 (3d Cir. 1985) (implication of unethical conduct non-actionable). When an opinion cannot be verified, it is not necessary for the speaker to provide the facts upon which the opinion is based. *See Moore*, 881

P.2d at 741. Accordingly, Grabel's statement in FNF's public records request is not actionable in defamation.

### C.  Transmission of Arizona Bid Protest Documents

FNF argues that the transmission of public records related to the Arizona bid protest does not constitute a false statement. Because FNF sent all of the documents related to the protest, it contends that NMDOT received a complete picture of the Arizona proceedings, entitling the transmission to a privilege under the RESTATEMENT (SECOND) OF TORTS § 611 (1977). (Doc. 94 at 6). Fisher asserts that the privilege does not apply because FNF conspired with Pulice to make the original false statements contained in the bid protest. (Doc. 104 at 6-7).

The Restatement, which New Mexico has adopted, privileges the publication of defamation "in a report of an official action or proceeding or of a meeting open to the public that deals with a matter of public concern . . . if the report is accurate and complete or a fair abridgement of the occurrence reported." *Furgason v. Clauson*, 785 P.2d 242, 245 (N.M. Ct. App. 1989) (quotation omitted). However, the privilege does not apply when the maker of the original defamatory publication reports the publication to others. RESTATEMENT (SECOND) OF TORTS § 611 cmt. c (1977). New Mexico courts have held that conspiracy imputes liability to co-conspirators, *Ettenson v. Burke*, 17 P.3d 440 (N.M. Ct. App. 2000), and it would be illogical to apply the privilege to documents produced and provided in furtherance of a conspiracy.

Fisher has sufficiently alleged a civil conspiracy, as described below. Accordingly, the privilege does not apply to FNF's transmission of the Arizona bid protest, and Fisher's defamation claim may proceed.

### D.  Statement Regarding Continued Partnering Between NMDOT and Fisher

FNF asserts that Grabel's statement asking whether NMDOT wished to continue partnering with Fisher is protected opinion. (Doc. 94 at 7). It states that Grabel's question reflects FNF's opinion of Fisher's conduct and the appropriateness of awarding public contracts to a company that engaged in criminal behavior. (*Id.*) Fisher concedes that this statement is not a basis for its defamation claim against FNF. (Doc. 104 at 7). Given Fisher's position, the Court finds that this statement is not actionable in defamation.

### E. Grabel's July 22, 2009 Letter

FNF asserts that Fisher has not pointed to any other false statements within Grabel's July 22, 2009 letter. (Doc. 94 at 7). The only other cited statement, that Grabel "falsely impugned Fisher NM's financial stability and/or Fisher NM's business ethics," is, according to FNF, too vague to satisfy pleading requirements. (Doc. 94 at 9). Fisher argues in its response that the July 22, 2009 letter does contain false information. (Doc. 104 at 7). Specifically, for the first time, Fisher points to one sentence that accuses Fisher of making "representations to NMDOT regarding Fisher's [costs] that were either untrue, incomplete or misleading." (*Id.* at 8 (citing 7/22/09 Letter re: Fisher Sand & Gravel's Misrepresentations, Doc. 81-4 Ex. M, at 1)). Fisher asserts that it sufficiently identified this sentence in its complaint by identifying the letter and the nature of the statement. (*Id.* (citing Compl. at ¶¶ 225-26)). From Fisher's response, it is clear that the July 22, 2009 letter and Grabel's statement that "falsely impugned" Fisher are one and the same.

FNF takes issue with Fisher's attempt to use its response to clarify its deficient complaint. (Doc. 133 at 4-5). However, given that a pleading lacking in specificity may only be dismissed pursuant to Rule 8 and is ordinarily subject to dismissal without prejudice, the Court will consider the substance of the allegedly defamatory sentence. The sentence cited by Fisher is,

as FNF contends and as demonstrated by the letter itself, introductory. FNF's description of Fisher's representations as untrue, incomplete or misleading is merely an opinion. However, the opinion is objectively verifiable, which means that FNF must fully disclose the facts on which the opinion was based. *See Marchiondo*, 649 P.2d at 472. The three-page letter and attachments thereto demonstrate that FNF explained its reasons for characterizing Fisher's representations as untrue, incomplete or misleading. Fisher has identified no defamatory statements in the remainder of the letter, implying that none of the facts described by FNF were false. The Court finds that the sentence Fisher identified in FNF's July 22, 2009 letter is non-actionable opinion, and no defamation claim is available based on the letter.

### F.   Defamation by Implication

In its response, Fisher contends that even if all of FNF's statements were true, the gist of the statements generates a defamatory implication. Specifically, the combination of FNF's cited statements implied that Fisher was violating federal laws and bidding requirements when it bid on the Las Cruces project. (Doc. 104 at 9). In New Mexico, to find defamation by implication, "the court must first examine what defamatory inferences might reasonably be drawn from a materially true communication, and then evaluate whether the author or broadcaster has done something beyond the mere reporting of true facts to suggest that the author or broadcaster intends or endorses the inference." *Moore*, 881 P.2d at 741 (quoting *White v. Fraternal Order of Police*, 909 F.2d 512, 520 (D.C. Cir. 1990)) (alteration omitted). In *Moore*, defamation by implication was found based on a single letter that included factual statements far beyond those essential to the author's point, which suggested that the author intended a negative inference. *Id.*

FNF argues that Fisher cannot rely on a claim of defamation by implication. First, FNF asserts that because Fisher is a public figure and FNF's statements discuss a matter of public

12

concern, Fisher cannot state a claim for defamation based on implication. (Doc. 133 at 7-8). As the Court found in its Memorandum Opinion and Order Denying FNF's Motion to Dismiss No. 1, FNF has not established that Fisher is a public figure. Accordingly, this argument is unavailing.

Next, FNF contends that the defamation by implication doctrine does not stretch to cover Fisher's claims. Here, the Court has concluded that Fisher sufficiently alleged that FNF's comments regarding Fisher's "conviction" and the republication of the Arizona bid protest were defamatory. The sole comments that could be subject to the claim of defamation by implication are Grabel's statements of opinion. As the Court discussed above, though, neither of those comments carried an implication of underlying defamatory facts. Accordingly, there can be no recovery in defamation for those statements, *see* RESTATEMENT (SECOND) OF TORTS § 566 (1977), and this theory does not salvage Fisher's claims based on Grabel's statements of opinion.

The Court shall grant in part and deny in part FNF's motion to dismiss Fisher's defamation claim. The motion shall be granted as to any defamation claim based on the specified statements by Grabel. The motion shall be denied as to Billings' characterization of the DPA as a conviction and the republication of the Arizona bid protest documents.

## IV.    Injurious Falsehood

Fisher claims that FNF committed injurious falsehood when Billings advised NMDOT that Fisher had been convicted of a crime, FNF forwarded the protest from the Arizona project, and Grabel shared information with Gershon and Chappelle that "falsely impugned Fisher NM's financial stability and/or Fisher NM's business ethics." (*Id.* at ¶¶ 225-30). Fisher states that FNF intended to harm Fisher and persuade NMDOT to deny Fisher the contract for the Las Cruces and Harding County projects. (*Id.* at ¶¶ 228, 232). Fisher also alleges that FNF knew that Fisher

had successfully defended its status as responsible in the Arizona bid protest. (*Id.* at ¶ 229). Chappelle apparently stated that NMDOT decided to reject Fisher and rebid the Las Cruces project based on FNF's statements about Fisher and NMDOT's concern that FNF would initiate a bid protest or lawsuit. (*Id.* at ¶ 233).

To state a claim for injurious falsehood, a plaintiff must allege facts that, if true, demonstrate that the plaintiff suffered a pecuniary loss resulting from a defendant's publication of a false statement, that the defendant intended the statement to result in harm or should have recognized that harm was the likely result, and that the defendant knew the statement was false or acted in reckless disregard of its falsity. *Bankwest v. Fid. & Deposit Co. of Md.*, 63 F.3d 974, 980 (10th Cir. 1995) (quoting RESTATEMENT (SECOND) OF TORTS § 623A (1979)).

In part, this claim rests on Grabel's statement in his July 22, 2009 letter that Fisher made "representations to NMDOT regarding Fisher's [costs] that were either untrue, incomplete or misleading." (*Id.* at 8 (citing 7/22/09 Letter re: Fisher Sand & Gravel's Misrepresentations, Doc. 81-4 Ex. M, at 1)). As described above, that statement is protected opinion, and the basis for that statement was described in the body of the letter as well as the attached exhibits. Accordingly, to the extent the injurious falsehood claim is based on Grabel's statement, it is not viable.

However, the remainder of FNF's statements to NMDOT, which include that Fisher was convicted of a crime and the transmission of the Arizona bid protest, support Fisher's injurious falsehood claim. The Court denies the motion to dismiss Fisher's injurious falsehood claim, except that Grabel's statement, described above, may not be used to support this claim.

## V.    Tortious Interference with Contractual Relations

Fisher brings a claim of tortious interference with prospective and existing contractual relations against FNF and Valerio. (Compl. at ¶¶ 237-73). Fisher asserts that the contracts at

issue are: (1) the implied or informal contract between Fisher and NMDOT requiring NMDOT to fairly consider bids in accord with applicable statutes and codes; (2) the implied contract between Fisher and NMDOT to award Fisher, as the lowest responsible bidder, the Las Cruces project; and (3) the existing contract between Fisher and NMDOT for the Harding County project. (*Id.* at ¶¶ 240-47). Fisher alleges that FNF's sole or, alternatively, primary motive was to harm Fisher, which was improper. (*Id.* at ¶ 247). The interfering conduct cited includes: (1) Billings sent an e-mail to Valerio stating that Fisher had been convicted of a crime; (2) Billings included letters drafted by Grabel on behalf of Pulice; (3) Valerio forwarded these communications to all decision-makers on the Las Cruces project without sending notice to Fisher; (4) Valerio considered these communications and acted to reject Fisher's bid and instead award the Las Cruces project to FNF; (5) Grabel, on July 22, 2009, spoke to Gershon and Chappelle and asserted "false and injurious information" that impugned Fisher's financial stability, business ethics, "and/or" status as a responsible bidder; (6) Grabel sent two additional e-mails to Gershon and Chappelle about a pending bid protest against Fisher in Nevada. (*Id.* at ¶¶ 248-58). Because FNF knew that Fisher successfully defended its status as a responsible bidder, Fisher contends that all of the above statements and actions were malicious. (*Id.* at ¶¶ 260-61).

New Mexico recognizes the tort of interference with contractual relations based on both existing and prospective contracts. *Zarr v. Wash. Tru Solutions, LLC*, 208 P.3d 919, 921 (N.M. Ct. App. 2009) (citations omitted). To set forth a claim of tortious interference with an existing or prospective contract, Fisher must allege that (1) FNF knew of the NMDOT contract; (2) performance of the contract was refused; (3) FNF played an "active and substantial part" in causing Fisher to lose the benefit of the contract; (4) damages resulted from the breach; and (5) FNF induced the breach "without justification or privilege[.]" *Gregory Rockhouse Ranch, LLC v.*

*Glenn's Water Well*, 191 P.3d 548, 557 (N.M. Ct. App. 2008) (abrogated in irrelevant part by *Helena Chem. Co. v. Uribe*, 281 P.3d 237 (N.M. 2012)) (citations omitted); *Ettenson*, 17 P.3d at 446 (citations omitted). "Without justification" means that FNF must have acted with an improper motive or through improper means, such as violating a statute or using fraudulent misrepresentations. *Ettenson*, 17 P.3d at 446 (citations omitted); RESTATEMENT (SECOND) OF TORTS § 767 cmt. c (1977). However, when a claim relates to a prospective contract, the meaning of "without justification" is modified, and a plaintiff must show that the defendant acted through improper means or with the sole motive of harming the plaintiff. *Fikes v. Furst*, 81 P.3d 545, 552 (N.M. 2003) (citation omitted).

   A.  *Interference Claim based on False Statements*

   FNF first argues that Fisher's interference with contract claim should be dismissed because FNF made no false statements. (Doc. 94 at 15). Because the Court has concluded that Billings' characterization of the DPA and the republication of the ADOT bid protest give rise to a viable claim for defamation, this argument fails.

   B.  *Existing Contract Related to Las Cruces Project*

   FNF's next argument is based on a misreading of the complaint. Fisher claims that it had an existing and implied contract with NMDOT requiring NMDOT to fairly consider all bids for the Las Cruces project in accordance with the Procurement Code, not that the Las Cruces project was an existing contract. (*See* Doc. 104 at 11-12). When an agency requests bid proposals, it enters an implied contract that it will consider each bid as set forth in the Procurement Code. *Planning & Design Solutions v. City of Santa Fe*, 885 P.2d 628, 635 (N.M. 1994). Thus, if the agency violates the bidding process, it breaches an implied contract and damages are available. *Id.* at 636.

16

Given that clarification, FNF contends in its reply that a unilateral implied contract of the sort discussed in *Planning & Design Solutions* cannot be relied upon to assert a claim for tortious interference with contract. (Doc. 133 at 10). Indeed, FNF points to New Mexico decisions suggesting that only bilateral contracts, which impose duties on both parties, will support tortious interference claims. (*Id.* (citing *Lenscrafters, Inc. v. Kehoe*, 282 P.3d 758 (N.M. 2012))). However, this argument was only raised in FNF's reply, and the Court has been unable to find any law directly and cogently addressing the issue. Accordingly, the Court deems it improper to consider this argument at this time and denies FNF's request to dismiss the interference with contract claim based on the existing, implied contract between NMDOT and Fisher to fairly consider all bids without prejudice. *See Hill v. Kemp*, 478 F.3d 1236, 1251 (10th Cir. 2007) ("[O]ur rule against entertaining new arguments in reply in no way precludes us from supplementing the contentions of counsel through our own efforts. But neither does it compel us to undertake such self-directed research or pursue late and undeveloped arguments, and we exercise caution in doing so . . . ."). FNF is free to reassert this argument in a future motion.

C. *Prospective Contract for Las Cruces Project*

FNF argues that, if the Las Cruces project constitutes a prospective contract, Fisher failed to establish that FNF's sole motive was to harm Fisher or that FNF acted through improper means. (Doc. 94 at 18-21). Fisher concedes that its claim for interference with the Las Cruces project contract is a claim based on a prospective contract. (Doc. 104 at 13-16). Though Fisher argues all elements of its claim, FNF only contests one: the "without justification" element. This dispute is easily resolved, because the Court has found that Fisher's allegations of defamation were sufficient in some respects. Accordingly, Fisher has alleged a plausible claim that FNF

acted through improper means to interfere with Fisher's prospective contract for the Las Cruces project, and FNF's motion to dismiss this claim is denied.

### D.  Harding County Contract

Finally, FNF contends that Fisher fails to establish a claim for interference with an existing contract for the Harding County project. (Doc. 94 at 21-22). FNF points to the fact that Fisher makes no allegation that FNF was aware of or intended to interfere with the Harding County contract, merely stating that FNF's communication "spilled over and tainted NMDOT's handling of the Harding County Project." (Compl. at ¶ 43; *see also* Compl. at ¶¶ 326-27). Fisher argues that FNF had constructive knowledge of the contract based on standard industry practices. (Doc. 104 at 16-17). Specifically, Fisher contends that because FNF is a licensed public contractor in New Mexico and Fisher's competitor, it knew that NMDOT awarded the Harding County contract to Fisher. (*Id.* at 17).

To state a claim for intentional interference with existing contract, a plaintiff must set out facts demonstrating that the defendant was aware of the specific contractual right and not just the business relationship with which it interfered. RESTATEMENT (SECOND) OF TORTS § 766 cmt. i (1977) ("To be subject to liability under the rules stated in this Section, the actor must have knowledge of the contract with which he is interfering and of the fact that he is interfering with the performance of the contract. Although the actor's conduct is in fact the cause of another's failure to perform a contract, the actor does not induce or otherwise intentionally cause that failure if he has no knowledge of the contract."). Here, Fisher specifically alleged that the loss of the Harding County project was a spillover effect. (Compl. at ¶¶ 43, 326-27). That allegation does not satisfy the rigorous standard applicable to intentional torts. Plaintiffs do not allege in

their complaint that FNF had knowledge of the Harding County contract, actual or otherwise. That absence is fatal to Fisher's claim of intentional interference with contractual relations based on the Harding County project.

## VI.   Civil Conspiracy

Fisher's claim of civil conspiracy is brought against FNF, Pulice, Billings and Basila. (Compl. at ¶¶ 162-176). It is premised on Fisher's contention that the Defendants agreed to work in concert to challenge Fisher's status as a responsible bidder "and to commit tortious acts . . . ." (*Id.* at ¶ 163). Pursuant to the agreement, FNF and Billings were to challenge Fisher's responsibility and the bid on the Las Cruces Project while Basila and Pulice were to do the same in Arizona. (*Id.* at ¶ 164). As to Pulice and Basila, Fisher cites the improper bid protest on the Arizona project and false statements made in the protest. (*Id.* at ¶ 166). As to FNF and Billings, Fisher cites the secret de facto bid protest regarding the Las Cruces project and false statements made therein. (*Id.* at ¶ 167). Fisher also cites the July 15, 2009 meeting with ADOT Engineer Floyd Roehrich and the false statements by Basila and Billings that Fisher was not financially solvent. (*Id.* at ¶ 168). Fisher asserts that these events constituted defamation and interference with existing and prospective contractual relations, resulting in injury to Fisher's reputation and standing and the loss of NMDOT contracts for the Las Cruces and Harding County projects. (*Id.* at ¶¶ 172-175).

A civil conspiracy is "an agreement to accomplish an unlawful purpose or a lawful purpose by unlawful means." *Santa Fe Techs., Inc. v. Argus Networks, Inc.*, 42 P.3d 1221, 1235 (N.M. Ct. App. 2001) (citation omitted). A prima facie case of conspiracy requires the plaintiff to establish the following: (1) an existing conspiracy between two or more defendants; (2) specific wrongful acts that the defendants carried out pursuant to the conspiracy; and (3) resulting

damage to the plaintiff. *Ettenson*, 17 P.3d at 445 (quoting *Silva v. Town of Springer*, 912 P.2d 304, 310 (N.M. Ct. App. 1996)). A conspiracy may be established by circumstantial evidence from the facts and circumstances, including the acts of the alleged co-conspirators. *Santa Fe Techs.*, 42 P.3d at 1236 (citing *Morris v. Dodge Country, Inc.*, 513 P.2d 1273, 1274 (N.M. Ct. App. 1973)). Civil conspiracy is not an independent basis for liability but is a means to hold co-conspirators liable for damages established in a separate claim against one of the conspirators. *Seeds v. Lucero*, 113 P.3d 859, 864 (N.M. Ct. App. 2005) (citing *Ettenson*, 17 P.3d at 445).

There is no dispute that Fisher sufficiently alleges that Pulice and FNF agreed to challenge Fisher's status as a responsible bidder. The dispute revolves around whether that combination involved an agreement to commit tortious acts.[3] (Doc. 104 at 21; Doc. 133 at 5-6); *see also Las Luminarias of N.M. Council of the Blind v. Isengard*, 587 P.2d 444, 447 (N.M. Ct. App. 1978) ("To constitute an actionable civil conspiracy, there must be a combination by two or more persons to accomplish an unlawful purpose or to accomplish a lawful purpose by unlawful means."). As found in this Order, Fisher has pleaded sufficient facts to support its claims that FNF committed the torts of defamation, interference with contractual relations, and prima facie tort.[4] Additionally, Fisher pleaded that Pulice committed torts against it. At this stage, Fisher's allegations of tortious conduct and of FNF and Pulice's agreement to challenge Fisher's status suffice to state a claim for civil conspiracy.

## VII.    Prima Facie Tort

As an alternative claim, Fisher asserts that FNF committed a prima facie tort based on the NMDOT's decision to reject all bids on the Las Cruces project. (Compl. at ¶¶ 274-292). Fisher cites again to Grabel's conversations with Gershon and Chappelle. (*Id.* at ¶¶ 282-84). Fisher

---

[3] Fisher clarifies that its conspiracy claim is based on tortious acts, not an improper purpose. (Doc. 104 at 21 n.10).
[4] This renders the case cited by FNF, *Saylor v. Valles*, 63 P.3d 1152 (N.M. Ct. App. 2002), distinguishable. (*See* Doc. 94 at 12).

further cites to the "improper secret *de facto* bid protest . . . ." (*Id.* at ¶ 286). That includes Grabel's communications with Gershon and Chappelle and statements to Arizona Engineer Roehrich. (*Id.*) Fisher alleges that the statements were improper, made without its knowledge, and intended to persuade NMDOT to not award the Las Cruces project to Fisher. (*Id.*) Fisher alleges the communications were made without sufficient justification and through surreptitious and unlawful means. (*Id.* at ¶ 287). Ultimately, Fisher states it was injured because NMDOT rejected all bids for the Las Cruces project and denied the contract for the Harding County project. (*Id.* at ¶¶ 289-92).

Prima facie tort exists to provide a "remedy for intentionally committed acts that do not fit within the contours of accepted torts . . . ." *Schmitz v. Smentowski*, 785 P.2d 726, 736 (N.M. 1990). A plaintiff asserting a claim for prima facie tort must allege facts that, if true, establish: (1) that the defendant committed an intentional, lawful act; (2) that the defendant intended to injure the plaintiff; (3) injury to the plaintiff resulted from the act; and (4) there was no justification for the act. *Kitchell v. Pub. Serv. Co. of N.M.*, 972 P.2d 344, 348 (N.M. 1998). Prima facie tort may be pleaded as an alternative theory of relief. *Schmitz*, 785 P.2d at 736. However, it should not be used to evade the stringent requirements of other established torts. *Id.* at 738. (citations omitted).

FNF does not dispute that Fisher's allegations satisfy the elements of a prima facie tort claim. Instead, FNF contends that Fisher is improperly using the prima facie tort doctrine to skirt the elements of established tort claims. (Doc. 94 at 22-23). Specifically, FNF asserts that Fisher's prima facie tort claim would circumvent the requirements for its defamation and civil conspiracy claims. (Doc. 133 at 12). Fisher contends that FNF's actions, as identified in the prima facie tort count, go beyond mere conspiracy or defamation. (Doc. 104 at 19).

As the parties have identified, there is considerable tension in the law relating to prima facie tort in New Mexico. In *Stock v. Grantham*, 964 P.2d 125 (N.M. Ct. App. 1998), the court found the dismissal of a prima facie tort claim proper because it was duplicative of other causes of action and would only serve to evade a requirement of intentional infliction of emotional distress. *Id.* at 135-36. Subsequent to *Stock*, the New Mexico Court of Appeals decided *Hagebak v. Stone*, 61 P.3d 201 (N.M. Ct. App. 2002), in which it allowed a prima facie tort claim to proceed despite the factual overlap between it and the plaintiff's defamation claim. *Id.* at 209. The New Mexico courts have faced the issue on several other occasions, but, when it comes to overlapping claims, the lines have not been clearly drawn. *Bradley v. Lovelace Sandia Health Sys.*, No. 27,936, 2009 WL 6667452, *3-4 (N.M. Ct. App. Nov. 13, 2009) (unpublished); *Guest v. Allstate Ins. Co.*, 205 P.3d 844, 857-858 (N.M. Ct. App. 2009), overruled in part on other grounds, 244 P.3d 342 (N.M. 2010); *Guest v. Berardinelli*, 195 P.3d 353, 364-65 (N.M. Ct. App. 2008); *Healthsource, Inc. v. X–Ray Associates of New Mexico*, 116 P.3d 861, 872 (N.M. Ct. App. 2005).

Nevertheless, the Court concludes that Fisher's factual allegations do extend beyond those supporting its defamation and conspiracy claims. Fisher's prima facie tort count focuses on the defendants' ex parte communications with NMDOT, including Grabel's letters and e-mails. As FNF repeatedly points out, the Procurement Code does not regulate the communications of bidders, so FNF's actions were arguably lawful. Fisher claims that those otherwise lawful communications were made intentionally with the intent to cause harm, elements which remove the communications from the realm of defamation. Given that the prima facie tort allegations diverge slightly from Fisher's other claims and the early stage of this proceeding, the Court will allow Fisher an opportunity to muster factual support for its prima facie tort claim. *See Hagebak*,

61 P.3d at 209 (cautioning that determining liability for prima facie tort is "a very fact-specific balancing process . . . ."). FNF's motion as to this claim shall be denied.

**THEREFORE,**

      **IT IS ORDERED** that FNF's Motion to Dismiss No. 3, filed July 2, 2012 (Doc. 93), is **GRANTED IN PART** and **DENIED IN PART**.

      **IT IS FURTHER ORDERED** that Fisher may not rely on Grabel's statements to establish defamation (Count II) and injurious falsehood (Count VI) and may not rely on the Harding County project to prove intentional interference with contractual relations (Count VII). In all other respects, FNF's motion is denied.

 

_____

**ROBERT C. BRACK**
**UNITED STATES DISTRICT JUDGE**