IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

FISHER SAND & GRAVEL CO.
d/b/a SOUTHWEST ASPHALT PAVING and
FISHER SAND & GRAVEL – NEW MEXICO, INC.,

      Plaintiff,

vs.                                                                                       No. 10-cv-0635 RB/SMV

FNF CONSTRUCTION, INC.,
PULICE CONSTRUCTION, INC.,
GARY GIRÓN, individually and as Cabinet Secretary
of the New Mexico Department of Transportation,
MAX VALERIO, individually and as Deputy Secretary
of the New Mexico Department of Transportation,
JED BILLINGS, Chief Executive Officer
of FNF Construction, Inc., and
STEPHEN BASILA, President of Pulice Construction, Inc.,

      Defendants.

**MEMORANDUM OPINION AND ORDER GRANTING IN PART
AND DENYING IN PART MOTION TO DISMISS NO. 4**

This case arises out of construction bidding processes in New Mexico and Arizona. After submitting bids, Defendant FNF Construction, Inc. ("FNF") and Pulice Construction, Inc. ("Pulice") allegedly contacted government officials in New Mexico and Arizona and provided information about the supposed criminal activities of Plaintiff Fisher Sand & Gravel, Co. ("Fisher"), d/b/a Southwest Asphalt Paving and Fisher Sand & Gravel – New Mexico, Inc., in an effort to exclude Fisher from the construction market. FNF has filed several motions to dismiss, which the Court will address in turn. FNF's fourth motion argues that Fisher's statutory claims against FNF fail to state a claim upon which relief can be granted. (Doc. 95). Having considered the submissions of counsel, relevant law, and otherwise being fully advised, the Court **GRANTS IN PART** and **DENIES IN PART** FNF's Motion to Dismiss No. 4.

### I.   Standard

Federal Rule of Civil Procedure 12(b)(6) authorizes a court to dismiss a complaint in whole or in part for failing to state a claim upon which relief is available. To survive a Rule 12(b)(6) motion to dismiss, a complaint must state a claim for relief that plausibly, not merely possibly, entitles the plaintiff to relief under the relevant law. *Robbins v. Oklahoma*, 519 F.3d 1242, 1247 (10th Cir. 2008) (citation omitted). In considering a motion to dismiss, the court must look within the four corners of the complaint and accept all well-pleaded factual allegations as true. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)); *Christy Sports, LLC v. Deer Valley Resort Co., Ltd.*, 555 F.3d 1188, 1191 (10th Cir. 2009) (citations omitted); *Issa v. Comp USA*, 354 F.3d 1174, 1177 (10th Cir. 2003) (citation omitted). However, the court need not accept as true legal conclusions contained in the complaint. *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 555).

### II.   Background

The Court has provided a detailed factual summary in its Memorandum Opinion and Order Denying FNF's Motion to Dismiss No. 1, and that background is incorporated herein by reference. Relevant to the instant motion, this case arises out of the bidding process for two separate road construction projects, one in Arizona (the "Arizona project") and one in New Mexico (the "Las Cruces project"). (*See* Verified Am. Compl., Doc. 81). During the bidding process, FNF and Pulice, competing construction companies, agreed to work together to exclude Fisher from the construction market in Arizona and New Mexico by challenging the company's status as a responsible bidder. To do so, FNF, Pulice, and their Presidents, Jed Billings and Stephen Basila, made various statements and submitted various documents to officials with the New Mexico Department of Transportation ("NMDOT") and the Arizona Department of

Transportation ("ADOT"). As a result of the Defendants' actions, Fisher alleges that NMDOT rejected all bids for the Las Cruces project and cancelled another project, the Harding County project, which had been awarded to Fisher.

In its Motion to Dismiss No. 4, FNF addresses the three statutory claims that Fisher has raised against it. First, it contends that Fisher has failed to establish a basis to hold FNF liable under 42 U.S.C. § 1983, given that FNF is a private party. (Doc. 96 at 2-5). Next, FNF argues that Fisher failed to plead essential elements of a claim under the Racketeering Influenced Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(c) and (d). (*Id.* at 5-16). Finally, FNF asserts that Fisher does not have standing to bring a claim under the New Mexico Unfair Trade Practices Act ("UPA"), N.M. STAT. ANN. § 57-12-1, *et seq.* (*Id.* at 17-19). Fisher opposes the motion in its entirety, arguing that the motion misstates the law and ignores the fundamental allegations of Fisher's complaint. (Doc. 105).

### III.    42 U.S.C. § 1983 Claim

To state a claim under 42 U.S.C. § 1983, a plaintiff must allege "(1) a violation of rights protected by the federal Constitution or created by federal statute or regulation, (2) proximately caused (3) by the conduct of a 'person' (4) who acted under color of any statute, ordinance, regulation, custom, or usage, of any State . . . ." *Beedle v. Wilson*, 422 F.3d 1059, 1064 (10th Cir. 2005) (quoting *Summum v. City of Ogden*, 297 F.3d 995, 1000 (10th Cir. 2002)) (alteration omitted). FNF asserts that Fisher's allegations are insufficient to show a constitutional violation with regard to the Las Cruces project and, in whole, fail to satisfy the "state action" element.

In Count IX, Fisher alleges that FNF acted in concert with NMDOT and its officers, including Gary Girón and Max Valerio, under color of law to violate substantive and procedural requirements of the Procurement Code and to deprive Fisher of a definite liberty or property

interest with regard to the Las Cruces and Harding County projects. (Compl. at ¶ 294). Specifically, Fisher asserts that its liberty and/or property interests in the Las Cruces and Harding County projects were violated by NMDOT's failure to follow the appropriate procedures and failure to award the projects to Fisher. (*Id.* at ¶¶ 297-99, 312, 325, 333). Fisher alleges that "FNF and Billings were willful participants in joint action with NMDOT." (*Id.* at ¶ 302). In the process of awarding the Las Cruces project contract, FNF undertook a secret, de facto bid protest in which NMDOT engaged, and on which it relied, in denying Fisher the award of the contract. (*Id.* at ¶¶ 296-309). As to the Harding County contract, Fisher alleges that "FNF, Billings, and NMDOT's bad faith with respect to the Las Cruces Project spilled over to the Harding County Project and tainted the process for awarding the Harding County Project." (*Id.* at ¶ 326). The specific actions alleged were that FNF presented information to NMDOT and NMDOT considered that information and allowed it to influence the decision to cancel the Harding County project. (*Id.*) Additionally, Fisher alleges that FNF, Billings, and the NMDOT Defendants "shared a common unconstitutional goal—to deprive Fisher NM of the award of the Las Cruces Project and to deprive Fisher NM of its right to have the contract awarded in a lawful and non-arbitrary fashion." (*Id.* at ¶ 301). Later, Fisher alleges that the shared goal was "to deprive Fisher NM of NMDOT contracts . . . ." (*Id.* at ¶ 327).

First, FNF argues that Fisher did not have any constitutionally protected interests in the Las Cruces project. The Tenth Circuit determined in a decision filed March 6, 2012 that Fisher did not have a constitutionally protected property interest in the Las Cruces project and that, as a result, no due process violation occurred in denying Fisher the Las Cruces project. *Fisher Sand & Gravel, Co. v. Girón*, 465 F. App'x 774, 783 (10th Cir. 2012) (unpublished). Significantly, the court did not simply determine that the interest in the Las Cruces project was not clearly

established, entitling the NMDOT Defendants to qualified immunity; instead, the court found that Fisher had no protected property interest in the Las Cruces project. *Id.* Because this determination set out a ruling as a matter of law, it constitutes the law of the case and continues to govern Fisher's asserted property interest in the Las Cruces project. *Rimbert v. Eli Lilly & Co.*, 647 F.3d 1247, 1251 (10th Cir. 2011) (citations omitted). As such, the Tenth Circuit's determination requires the Court to dismiss the claim to the extent it is based on Fisher's constitutionally protected interest in the Las Cruces project. The remaining alleged deprivation supporting Fisher's § 1983 claim is its interest in the Harding County project.

FNF argues that the remaining portion of Fisher's § 1983 claim is subject to dismissal because Fisher's factual allegations fail to show that it, a private party, can be held liable under § 1983. Section 1983 liability only attaches to conduct that occurs under color of state law. Thus, the "only proper defendants in a Section 1983 claim are those who 'represent the state in some capacity, whether they act in accordance with their authority or misuse it.'" *Gallagher v. Neil Young Freedom Concert*, 49 F.3d 1442, 1447 (10th Cir. 1995) (quoting *NCAA v. Tarkanian*, 488 U.S. 179, 191 (1988)) (alteration omitted). The Tenth Circuit has cogently explained the applicable tests to determine whether a private party is a proper defendant in a § 1983 action. *See Gallagher*, 49 F.3d at 1447. The four possible tests that can be employed when conducting a state action analysis include: "(1) the public function test, (2) the nexus test, (3) the symbiotic relationship test and (4) the joint action test." *Johnson v. Rodrigues*, 293 F.3d 1196, 1202 (10th Cir. 2002) (summarizing *Gallagher*, 49 F.3d at 1447). Fisher relies on the joint action and nexus tests in arguing that FNF acted under color of state law.

Before discussing these tests, the Court must address a preliminary issue. Unlike the usual case in which a plaintiff seeks to hold a public entity responsible for the acts of a private

party under § 1983, Fisher seeks to impose liability against a private party for the harmful actions of a public entity. The conduct complained of, both in failing to award the New Mexico contracts in a lawful fashion and denying Fisher the Harding County contract, was unquestionably state conduct. The issue presented is whether FNF, as a private party, can be held liable for its alleged involvement in that conduct. This atypical claim requires the Court to "step through an analytical looking glass . . . ." *NCAA v. Tarkanian*, 488 U.S. 179, 192-93 (1988).

"Under the nexus test, a plaintiff must demonstrate that 'there is a sufficiently close nexus' between the government and the challenged conduct such that the conduct 'may be fairly treated as that of the State itself.'" *Gallagher*, 49 F.3d at 1448 (quoting *Jackson v. Metro. Edison Co.*, 419 U.S. 345, 351 (1974)). Applying the nexus test to the atypical situation presented by Fisher is illogical. The challenged conduct, the cancellation of the NMDOT contract, is state conduct. To apply this test to Fisher's complaint, it would have to be applied in reverse: the plaintiff would be required to show that the state's conduct and the private actions are linked by a close nexus. There is no precedent supporting the application of the nexus test in reverse. Indeed, the application of the reverse nexus test is clearly foreclosed by the well-established principle that a private party cannot be sued under § 1983 merely because his actions influenced, even strongly, the challenged state action. *Tarkanian*, 488 U.S. at 193-95; *Sigmon v. Communitycare HMO, Inc.*, 234 F.3d 1121, 1127 (10th Cir. 2000). Accordingly, the Court finds that the nexus test is inapplicable.

Under the joint action test, "state action is also present if a private party is a 'willful participant in joint action with the State or its agents.'" *Gallagher*, 49 F.3d at 1453 (citing *Dennis v. Sparks*, 449 U.S. 24, 27 (1980)). When applying this analysis, courts generally "examine whether state officials and private parties have acted in concert in effecting a particular

deprivation of constitutional rights." *Id.* If there is a substantial degree of cooperative action between state and private actors, or if there is "overt and significant state participation" in carrying out the deprivation of the plaintiff's constitutional rights, state action is present. *Id.* at 1454 (citing *Hoai v. Vo*, 935 F.2d 308, 313 (D.C. Cir. 1991)). One way to establish joint action in the Tenth Circuit is to demonstrate that the public and private actors engaged in a conspiracy, which requires an allegation that the actors shared a common, unconstitutional goal and specific facts tending to show both agreement and concerted action. *Sigmon*, 234 F.3d at 1126 (quotations and citations omitted). Another important inquiry in determining whether joint action is shown is whether a public actor abdicated its authority to the private party. *Id.* at 1127. However, as explained above, the mere fact that a private party's actions influenced the state's action, even if the state would not have acted but for the actions of the private party, is insufficient to establish joint action. *Tarkanian*, 488 U.S. at 193-95; *Sigmon*, 234 F.3d at 1127.

Applying this test requires the Court to consider the specific challenged action and the relationship between the private party and the state actor as it relates to the challenged action. Here, Fisher has sufficiently alleged that NMDOT's decision to cancel the bids for the Harding County project was influenced by the information that FNF provided to NMDOT. However, NMDOT retained ultimate decision-making authority and could have disregarded FNF's statements. *See Tarkanian*, 488 U.S. at 194-95. There is no allegation that FNF bribed, conspired with, or entered an agreement with NMDOT to cancel the Harding County project. *Dennis*, 449 U.S. at 28-29. Indeed, Fisher does not even allege that FNF provided information in an effort to thwart the award of the Harding County contract. Fisher's unambiguous allegations are that FNF's actions, targeted to the Las Cruces project, "spilled over" and influenced the contract for the Harding County project. (Compl. at ¶¶ 326-27). Thus, there is clearly no allegation of

concerted action by NMDOT and FNF with regard to the Harding County contract. *See Sigmon*, 234 F.3d at 1127 (quotations and citations omitted). Finally, it is clear that NMDOT retained complete authority to determine the award and availability of NMDOT contracts. *See id.* When a private actor does not direct or actively participate in the state action complained of, he cannot be held liable under § 1983. *See Tarkanian*, 488 U.S. at 193-96; *Sigmon*, 234 F.3d at 1126-27.

Fisher relies on *Cordova v. Vaughn Mun. Sch. Dist. Bd. of Educ.*, 3 F. Supp. 2d 1216 (D.N.M. 1998), and *Fraser v. Schultze*, 663 F. Supp. 512 (N.D. Ill. 1987), in arguing that its allegations are sufficient under the joint action test. However, both cases are distinguishable. In *Cordova*, the private attorney that the court concluded acted under color of state law was a contract employee of the school board, a public entity, who participated actively in the discussions and activities that culminated in the challenged discipline, including writing letters for a state actor's signature containing false accusations and discussing the appropriate level of discipline with state actors. 3 F. Supp. 2d at 1220-22. *Fraser* is entirely distinguishable because the plaintiff's § 1983 claim rested on a private party's misuse of a state statute, which ordinarily is not considered action under color of state law but can become state action if done in concert with a state official who abused his authority. 663 F. Supp. at 515-16 (citing *Greco v. Guss*, 775 F.2d 161, 167-69 (7th Cir. 1985)); *see also London v. RBS Citizens, N.A.*, 600 F.3d 742, 746-47, 747 n.3 (7th Cir. 2010). There is no allegation here that FNF misused a state statute, that FNF was employed by NMDOT, or that FNF actively participated in any discussion regarding the Harding County project.

Fisher's allegations are insufficient to show that FNF willfully participated in NMDOT's decision to cancel the Harding County project. Accordingly, FNF's motion to dismiss Fisher's § 1983 claim against it shall be granted.

### IV. RICO Claim

"RICO provides a cause of action for those injured in business or property by reason of prohibited racketeering activities." *Bixler v. Foster*, 596 F.3d 751, 756 (10th Cir. 2010) (citing 18 U.S.C. § 1964(c)). To state a claim under RICO, a plaintiff must allege "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *Id.* at 761 (quoting *Gillmor v. Thomas*, 490 F.3d 791, 797 (10th Cir. 2007)). To form a "pattern," at least two acts of racketeering activity are required. 18 U.S.C. § 1961(5).

First, the Court must address the argument that FNF raises last: the sufficiency of Fisher's damages allegation. To have standing to bring a RICO action, a plaintiff must have suffered injury. Injury has been defined as actual damage to the plaintiff's business or property due to the pattern of racketeering activity. 18 U.S.C. § 1964(c); *Tal v. Hogan*, 453 F.3d 1244, 1253-54 (10th Cir. 2006) (citations omitted); *In re Taxable Mun. Bond. Sec. Litig.*, 51 F.3d 518, 523 (5th Cir. 1995) (citation omitted). Because this inquiry is deeply intertwined with the merits of the RICO claim, lack of RICO standing does not divest the court of jurisdiction over the action. *Lerner v. Fleet Bank, N.A.*, 318 F.3d 113, 116-17 (2d Cir. 2003).

Fisher alleges that the RICO violations have caused it "severe financial and business damage . . . ." (Compl. at ¶ 359). In response to FNF's motion, Fisher asserts that its lost profits from projects that NMDOT refused to award it are the actual damages supporting its standing to bring a RICO claim. (Doc. 105 at 19-20). Because Fisher relies solely on its lost profits, the Court does not address the other areas of injury alleged in Fisher's complaint.

The parties strongly dispute whether lost profits suffice to constitute a RICO injury. From the cases cited by the parties, a clear pattern emerges: the more speculative the profits, the less likely the court is to find RICO standing. *Compare Price v. Pinnacle Brands, Inc.*, 138 F.3d 602,

9

607 (5th Cir. 1998) (purchasing a pack of sports trading cards with a chance that collectible cards would be included generates nothing more than an expectancy interest in the collectible cards and the absence of a collectible card does not constitute a RICO injury), *and Hecht v. Commerce Clearing House, Inc.*, 897 F.2d 21, 24 (2d Cir. 1990) (holding that "injury in the form of lost business commissions . . . is too speculative to confer standing, because Hecht only alleges that he would have lost commissions in the future, and not that he has lost any yet."), *with Phoenix Bond & Indem. Co. v. Bridge*, 477 F.3d 928, 930 (7th Cir. 2007) (concluding that regular participants in a county's tax sales, in which participants bid on and win liens, sufficiently alleged RICO injury based on liens that plaintiff would have obtained but for defendant's misconduct). Here, Fisher has alleged that two contracts were to be awarded to it but were not based on Defendant's conduct. The contracts, and the amount each contract was worth, are specific. Furthermore, Fisher has pointed to specific facts that support its claim that it was going to be awarded the contracts. Indeed, it alleges that it had already made expenditures in regard to the Harding County project. Thus, the Court deems Fisher's allegations sufficient to withstand FNF's motion to dismiss for failure to allege a RICO injury.

Reaching the substance of Fisher's RICO claim, FNF first disputes the "enterprise" element, asserting that establishing an enterprise requires a plaintiff to allege facts showing that the defendants formed an ongoing organization with a decision-making framework that is separate from the pattern of racketeering activity. (Doc. 96 at 7-9). Fisher points out that FNF's contentions related to the enterprise element are grounded on a case that has been overruled. (Doc. 105 at 12-13 (citing *Boyle v. United States*, 556 U.S. 938 (2009))). In reply, FNF abandoned its argument related to the sufficiency of Fisher's allegations that there was an

enterprise. (*See* Doc. 131). Because the argument has been abandoned, the Court assumes that Fisher's allegations satisfy the enterprise element.

Fisher's RICO claim is based on predicate acts of wire fraud in violation of 18 U.S.C. § 1343. (Compl. at ¶¶ 367-80). To establish wire fraud, a plaintiff must prove the following: "(1) a scheme or artifice to defraud or obtain property by means of false or fraudulent pretenses, representations, or promises, (2) an intent to defraud, and . . . [(3)] the use of interstate wire or radio communications . . . ." *United States v. Cooper*, 654 F.3d 1104, 1116 (10th Cir. 2011) (citations omitted). Fisher alleges three instances of wire fraud: (1) a June 17, 2009 letter from Pulice to ADOT Engineer Floyd Roehrich, which was sent via e-mail to NMDOT; (2) a June 22, 2009 e-mail from Billings to an NMDOT official stating that Fisher had been convicted of a crime; and (3) a June 10, 2010 e-mail from Billings to Roehrich discussing one of Fisher's asphalt mixing facilities. (*Id.* at ¶¶ 367-69). Fisher includes a general allegation that "Members of the Enterprise utilized wire to communicate among themselves, as well as with their co-conspirators and officials and employees from various state agencies." (*Id.* at ¶ 371). Because member of the Enterprise were "located in New Mexico and Arizona[,]" Fisher alleges that "the Enterprise necessarily had to communicate using wires." (*Id.*)

The Court will first address FNF's contention that Fisher has not shown that the communications were false. FNF rests its argument on the discussion in its third motion to dismiss. The Court considered and rejected FNF's contentions in its third motion to dismiss, at least as to Billings' action in forwarding Pulice's letter to NMDOT and Billings' statement to NMDOT regarding the "conviction." (Doc. 180 at 8-12). The other predicate statements were not addressed in FNF's earlier motion. The Court finds that Fisher sufficiently alleged that the three listed statements were false and made with the intent to defraud.

11

Next, the Court addresses FNF's argument that Fisher failed to demonstrate that at least two of the communications were interstate communications. The wire fraud statute's "in commerce" language requires that the communications actually cross state lines. *United States v. Kieffer*, 681 F.3d 1143, 1153 (10th Cir. 2012) (citing *United States v. Schaefer*, 501 F.3d 1197, 1202 (10th Cir. 2007)). Here, it is reasonable to infer that at least two of the communications crossed state lines. Specifically, FNF is based in Arizona and its President sent multiple e-mails to an NMDOT official, including forwarding a letter written by Pulice and sending an additional e-mail accusing Fisher of having been convicted of a crime. Thus, Fisher has adequately alleged two predicate acts of racketeering activity in the course of one day.[1]

However, Fisher did not allege that the other predicate communications crossed state lines, and any communication between the Arizona-based companies and ADOT are presumptively intrastate. *See Meier v. Musburger*, 588 F. Supp. 2d 883, 907 (N.D. Ill. 2008) (citations omitted); *DeFazio v. Wallis*, 500 F. Supp. 2d 197, 204 (E.D.N.Y. 2007) (citations omitted); *Efron v. Embassy Suites (P.R.), Inc.*, 47 F. Supp. 2d 200, 205 (D.P.R. 1999) (citations omitted). Thus, the asserted predicate acts including Pulice's communication with ADOT and Billings' communication with Roehrich are presumptively intrastate, and Fisher has failed to allege that they satisfy the interstate element of wire fraud. Fisher's general allegation that other communications occurred that crossed state lines also fails to establish that additional predicate acts of wire fraud occurred. As with all allegations of fraud, wire fraud must be pled with particularity. FED. R. CIV. P. 9(b); *see also Tal*, 453 F.3d at 1263. Generally alleging that other communications occurred does not satisfy the particularity requirement. None of Fisher's other allegations, then, are adequate to establish any additional predicate acts of wire fraud.

---

[1] The attachments to the Complaint demonstrate that Billings' e-mail referencing Fisher's "conviction" and Billings' e-mails forwarding the ADOT bid protest were sent on June 22, 2009 between 9:53 a.m. and 11:57 a.m. (Doc. 81 Ex. K).

To establish a substantive RICO violation, a plaintiff must show that there was "a pattern of racketeering activity." 18 U.S.C. § 1962(c). At least two predicate acts of racketeering activity are required but not necessarily sufficient to demonstrate a pattern. *Heinrich v. Waiting Angels Adoption Servs., Inc.*, 668 F.3d 393, 409 (6th Cir. 2012). "'RICO is not aimed at the isolated offender,'" so, in addition to the predicate acts, a plaintiff must show that the racketeering predicates are related and amount to "a threat of continuing activity." *Tal*, 453 F.3d at 1267-68 (quoting *Resolution Trust Corp. v. Stone*, 998 F.2d 1534, 1544 (10th Cir. 1993)). This test has come to be called the "continuity plus relationship" test. *Bixler*, 596 F.3d at 761 (quoting *Sedima, S.P.R.L. v. Imrex Co., Inc.*, 473 U.S. 479, 496 n.14 (1985)). The relationship prong is fairly easy to satisfy: showing that the "predicate acts have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events is essentially all that is needed." *Id.* (quoting *Boone v. Carlsbad Bancorp., Inc.*, 972 F.2d 1545, 1555 (10th Cir. 1992)). The continuity showing, however, is more difficult. It "'is both a closed- and open-ended concept, referring either to a closed period of repeated conduct, or to past conduct that by its nature projects into the future with a threat of repetition.'" *Id.* (quoting *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 241 (1989)). The continuity requirement is intended to ensure that RICO is limited to activities constituting or threatening long-term criminal activity. *H.J. Inc.*, 492 U.S. at 243 n.4.

Fisher relies on open-ended continuity to prove the "pattern" element of its RICO claim. (Doc. 105 at 18). Open-ended continuity depends heavily on the facts of the case. *Resolution Trust Corp.*, 998 F.2d at 1543. For 12(b)(6) purposes, open-ended continuity is established if the plaintiff can plausibly allege "that there was a threat of continuing criminal activity beyond the period during which the predicate acts were performed." *Heinrich*, 668 F.3d at 410. The threat of

13

continuing racketeering activity need not be established exclusively by the predicate acts, and the court should consider the totality of the circumstances surrounding the commission of the acts. *Id.* (citation omitted); *see also Tal*, 453 F.3d at 1268 (citation omitted).

Recent circuit court decisions considering motions to dismiss RICO claims on the basis of failure to allege open-ended continuity suggest that extreme caution must be exercised. The most recent circuit court to discuss the concept of open-ended continuity found that a plaintiff sufficiently alleged a continuous pattern of racketeering activity by alleging four predicate acts over a two-month period. *Heinrich*, 668 F.3d 393. The court found no indication that the pattern of behavior would not continue indefinitely and deemed the allegations sufficient to show a pattern of racketeering activity. *Id.* at 41. The Tenth Circuit has expressed similar hesitation to dismiss RICO claims for failure to sufficiently allege a pattern. *See Tal*, 453 F.3d at 1268. The *Tal* Court assumed that misrepresentations in the course of bidding processes for one development contract over an approximately ten month period sufficed to state a pattern of activity under an open-ended continuity theory because questions of fact must be considered to determine the extent of the threat. *Id.*

Here, the scheme alleged is an ongoing one—to exclude Fisher from the construction markets in New Mexico and Arizona. There is no built-in ending point to the pattern of racketeering activity, which some courts have relied on to dismiss RICO claims. *See Gamboa v. Velez*, 457 F.3d 703 (7th Cir. 2006) (holding that the alleged scheme had a limited purpose and a built-in end point); *Thompson v. Paasche*, 950 F.2d 306, 311 (6th Cir. 1991) (finding no open-ended continuity because the fraudulent scheme to sell nine lots of land was inherently short-term). Moreover, though the predicate acts only occurred over a very brief duration, the 2010 e-mail adds to the totality of the circumstances supporting Fisher's allegation of an ongoing threat.

Thus, given the precedent on the issue of open-ended continuity and the early stage of the litigation, the Court is compelled to find that Fisher sufficiently alleged a threat of long-term racketeering activity.

Nevertheless, the Court is skeptical that Fisher's claims rise to the level of the criminal activity that Congress sought to penalize through RICO. The pattern requirement, as further defined in *H.J., Inc.*, was intended to "forestall RICO's use against isolated or sporadic criminal activity, and to prevent RICO from becoming a surrogate for garden variety fraud actions properly brought under state law." *Corley v. Rosewood Care Ctr., Inc. of Peoria*, 388 F.3d 990, 1002 (7th Cir. 2004) (quotation omitted). It seems that Fisher may be, as courts have warned against, attempting to "fit a square peg in a round hole by squeezing garden-variety business disputes into civil RICO actions." *Midwest Grinding Co., Inc. v. Spitz*, 976 F.2d 1016, 1025 (7th Cir. 1992). However, given the dearth of controlling precedent and the procedural posture of the case, the Court is bound to allow Fisher's RICO claim to proceed. FNF's motion to dismiss as to the RICO claim shall be denied.

### V. Unfair Practices Act Claim

FNF's final argument is that Fisher has no standing to bring a claim under the UPA and failed to allege facts to establish essential elements of such a claim. FNF asserts that Fisher lacks standing under the UPA because Fisher is not a consumer of FNF's goods or services. Fisher does not dispute that it is not a consumer; rather, it asserts that claims between competitors may be brought pursuant to the UPA.

As with any question of statutory interpretation, the Court begins with the text of the law itself. *See Corum v. Roswell Senior Living, LLC.*, 248 P.3d 329, 331 (N.M. Ct. App. 2010) (citation omitted). The UPA provides a cause of action for damages to "[a]ny person who suffers

any loss of money or property, real or personal, as a result of any employment by another person of a method, act or practice declared unlawful by the Unfair Practices Act . . . ." N.M. STAT. ANN. § 57-12-10. A "person" is defined as including "natural persons, corporations, trusts, partnerships, associations, cooperative associations, clubs, companies, firms, joint ventures or syndicates . . . ." N.M. STAT. ANN. § 57-12-2(A). An "unfair or deceptive trade practice" is defined as

> a false or misleading oral or written statement, visual description or other representation of any kind knowingly made in connection with the sale . . . of goods or services . . . by a person in the regular course of the person's trade or commerce, that may, tends to or does deceive or mislead any person . . . .

N.M. STAT. ANN. § 57-12-2(D).

While the language of the statute does not include the standing limitation suggested by FNF, the applicability of the statute has been curtailed by controlling precedent. As it has been interpreted in New Mexico, the UPA is exclusively aimed at consumer protection. *See Ashlock v. Sunwest Bank of Roswell*, 753 P.2d 346, 348 (N.M. 1988), *overruled on other grounds by Gonzales v. Surgidev Corp.*, 899 P.2d 576, 583 (N.M. 1995) ("[W]e ensure that the Unfair Practices Act lends the protection of its broad application to innocent consumers."). In *Santa Fe Custom Shutters & Doors, Inc. v. Home Depot U.S.A., Inc.*, 113 P.3d 347 (N.M. Ct. App. 2005), the court interpreted the definition of "unfair trade practices" as contemplating "a plaintiff who seeks or acquires goods or services and a defendant who provides goods or services." *Id.* at 352. The court found that a company producing shutters did not have standing to sue the company that contracted to sell the produced shutters because the UPA, as consumer protection legislation, "gives standing only to buyers of goods or services." *Id.* at 353. Thus, under *Santa Fe Custom Shutters*, the UPA does not provide standing to Fisher in a lawsuit against its competitor for

unfair or deceptive practices because, in the commercial interaction at issue, Fisher is not a buyer of goods or services.

Fisher argues that, under *Lohman v. Daimler-Chrysler Corp.*, 166 P.3d 1091 (N.M. Ct. App. 2007), decided two years after *Santa Fe Shutters*, it remains entitled to bring a UPA claim against FNF. In *Lohman*, the court allowed a plaintiff to bring an action under the UPA even though there was no commercial transaction between the parties. *Id.* at 1097. The plaintiff in *Lohman* was a consumer who purchased a good, and the good was produced by the defendant, but the defendant did not sell the good directly to the plaintiff. *Id.* at 1092-93. The court found that lawsuits for misrepresentations that bear on downstream sales are actionable under the UPA because the UPA's plain language does not require that the misrepresentations occur in the course of a sale or that there be a transaction between the parties. *Id.* at 1097-98.

Though *Lohman* did broaden the applicability of the UPA after *Santa Fe Shutters*, it did not broaden it to the extent suggested by Fisher. As the New Mexico Court of Appeals has since explained, "[w]hile we agree that *Lohman* does not require a transaction between a claimant and a defendant, *Lohman* does stand for the proposition that the plaintiff must have sought or acquired goods or services and the defendant must have provided goods or services." *Hicks v. Eller*, 280 P.3d 304, 309 (N.M. Ct. App. 2012). Thus, to assert a UPA claim, a plaintiff must be a consumer of goods or services and a defendant must have, at some point, been a provider of those goods or services. *Id.*

Fisher contends that some provisions of the UPA are logical only if a non-consumer brings the claim, such as the provision prohibiting disparagement of "the goods, services, or business of another by false or misleading representations . . . ." N.M. STAT. ANN. § 57-12-2(D)(8). Given the interpretation of the statute by New Mexico courts, it is clear that the UPA is

intended as a sword for consumers, and the disparagement provision merely provides another weapon in a consumer's arsenal to remedy unfair practices. When a provider of goods or services falsely disparages the goods or services of another, a consumer could be induced to make a certain purchase based on the false information. Certainly, then, it is logical to allow a consumer to take action against such disparagement.

Fisher's complaint includes no allegation that it was a consumer of goods or services that FNF provided. Allowing UPA claims between competitors, such as the claim that Fisher has alleged, would open the UPA to uses never before contemplated in New Mexico and generate an unforeseen wave of UPA litigation. Thus, although the Court agrees that the language of the statute does not foreclose such actions, the controlling interpretations of the statute do.

**THEREFORE,**

**IT IS ORDERED** that FNF's Motion to Dismiss No. 4, filed July 2, 2012 (Doc. 95), is **GRANTED IN PART** and **DENIED IN PART**.

**IT IS FURTHER ORDERED** that Fisher's claims under 42 U.S.C. § 1983 and the New Mexico Unfair Trade Practices Act are dismissed against FNF.

_____
ROBERT C. BRACK
UNITED STATES DISTRICT JUDGE