IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

**FISHER SAND & GRAVEL CO.**
**d/b/a SOUTHWEST ASPHALT PAVING and**
**FISHER SAND & GRAVEL – NEW MEXICO, INC.,**

      **Plaintiff,**

vs.                                                                                                       No. 10-cv-0635 RB/SMV

**FNF CONSTRUCTION, INC.,**
**PULICE CONSTRUCTION, INC.,**
**GARY GIRÓN, individually and as Cabinet Secretary**
**of the New Mexico Department of Transportation,**
**MAX VALERIO, individually and as Deputy Secretary**
**of the New Mexico Department of Transportation,**
**JED BILLINGS, Chief Executive Officer**
**of FNF Construction, Inc., and**
**STEPHEN BASILA, President of Pulice Construction, Inc.,**

      **Defendants.**

## MEMORANDUM OPINION AND ORDER

This matter is before the Court on Defendants Pulice Construction Inc.'s and Stephen Basila's Motion for Partial Summary Judgment on Plaintiffs' Damages Claims (Doc. 504). Fisher Sand & Gravel, Co. (FSG) d/b/a Southwest Asphalt Paving and Fisher Sand & Gravel - New Mexico, Inc. (Plaintiffs) oppose this motion. Jurisdiction arises under 28 U.S.C. § 1331. Having considered the submissions of counsel and relevant law, the Court finds that the motion should be granted in part and denied in part. The Court **GRANTS** this motion with respect to Plaintiffs' claims for damages arising from the Las Vegas Project, the McGuireville Project, and attorney fees for the second responsibility hearing. The remainder of the motion is **DENIED**.

**I.      Background**

Plaintiffs, FNF, and Pulice are competitors in the bidding process for state road construction projects in Arizona and New Mexico. Jed Billings is the Chief Executive Officer of FNF, and Steve Basila is the President of Pulice. After the federal government indicted FSG and three of its former officers for tax fraud, FSG entered into a Deferred Prosecution Agreement ("DPA") in May 2009. Shortly thereafter, according to Plaintiffs, Pulice and FNF utilized FSG's legal problems in a bad faith effort to defame Plaintiffs' business reputation and convince state authorities in Arizona and New Mexico to refrain from awarding state road construction contracts to Plaintiffs.

On July 6, 2010, Plaintiffs filed suit against Defendants in this Court. (Doc. 1). In the Amended Complaint Plaintiffs allege claims for civil conspiracy (Count I), defamation (Counts II–IV), injurious falsehood (Counts V–VI), tortious interference with prospective and existing contractual relations (Count VII), prima facie tort (Count VIII), violation of 42 U.S.C. § 1983 (Count IX), violation of the Racketeer Influenced Corrupt Organization Act (RICO) (Count X), and violation of the New Mexico Unfair Practices Act (UPA) (Count XI). (Doc. 81). The Court dismissed the Section 1983 and UPA claims as well as some of the defamation, injurious falsehood, and the tortious interference with existing contractual relations claim (Counts III and IX and portions of Counts IV, VI, and VII). (Docs. 180, 188, 249, 251).

Pulice and Basila ("Pulice") move for summary judgment on Plaintiffs' claims for (1) lost profits on the Las Cruces Project; (2) anticipated equipment revenue on the Las Cruces Project, (3) loss incurred on the Las Vegas, New Mexico Project; (4) material costs incurred on the Arizona I-10 Project; (5) additional loss incurred on the Sedona Project; (6) loss incurred on

the McGuireville Project; and (7) attorney fees related to the Arizona Project responsibility hearings.[1] Defendants contend that these categories of damages have no factual support or no causal connection to the events giving rise to this lawsuit. Plaintiffs respond that their damages claims are both factually supported and causally connected to Pulice's actions, and material issues of fact preclude summary judgment.

## II.   Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). In cases where the moving party will not bear the burden of persuasion at trial, it bears the initial responsibility of identifying an absence of evidence to support the non-moving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). "If the movant meets this initial burden, the burden then shifts to the nonmovant to 'set forth specific facts' from which a rational trier of fact could find for the nonmovant." *Libertarian Party of N.M. v. Herrera*, 506 F.3d 1303, 1309 (10th Cir. 2007). When applying this standard, the court examines the record, makes all reasonable inferences, and views the facts in the light most favorable to the non-moving party. *Taylor v. Roswell Indep. Sch. Dist.*, 713 F.3d 25, 34 (10th Cir. 2013).

## III.   Facts[2]

In May of 2009, FSG bid on a project to perform work on Interstate 10 in Arizona. FSG was initially awarded the contract. However, in June, 2009, Pulice filed a bid protest with the Arizona Department of Transportation (ADOT) contending that FSG was not a responsible

---

[1] This list is of claims is presented in the order briefed by the parties. It is not in chronological order.
[2] Although the parties briefed the claims in a non-chronological order, the Court recounts the facts roughly in the order that they occurred.

3

bidder due to its past legal issues and the DPA. Plaintiffs claim that Pulice's bid protest was submitted in bad faith and that it triggered a series of other troubles for Plaintiffs.

As a result of Pulice's bid protest, ADOT held a responsibility hearing to ascertain whether FSG was a responsible bidder. FSG prevailed at the hearing and was re-awarded the I-10 project. However, Plaintiffs claim that the delay caused by Pulice's bid protest prevented FSG from purchasing nearby "borrow source" material, i.e., dirt for the project, which necessitated buying borrow source from farther away, at an increased cost of $204,750. Additionally, FSG claims that its relationship with ADOT was so soured by Pulice's actions that FSG experienced great difficulties doing business with ADOT. Consequently, issues at two subsequent Arizona projects (Sedona and McGuireville) were not handled in the field or according to ADOT's chain of command. Plaintiffs claim that these difficulties with ADOT caused FSG significantly increased costs and, ultimately, caused FSG to have to undergo a second responsibility hearing in July 2010.

Meanwhile in New Mexico, FNF had forwarded Pulice's Arizona bid protest documents to the New Mexico Department of Transportation (NMDOT) in June of 2009, in an effort to disqualify Plaintiffs from receiving contracts in New Mexico. As a result, Plaintiffs lost a multi-million dollar project in Las Cruces, New Mexico (the Las Cruces Project) on which Plaintiffs were the lowest responsible bidder. The loss of this project caused Plaintiffs to lose millions of dollars in expected profit and equipment revenue. In an attempt to mitigate its losses, Plaintiffs bid on a project in Las Vegas, New Mexico (the Las Vegas Project), but Plaintiffs sustained additional losses on that project due to a number of factors. Based on this factual background, the Court analyses Pulice's motion for summary judgment on the following

damages claims, which are presented in the order briefed by the parties and not in chronological order.

**IV.     Discussion**

**A.      Las Cruces Project**

    **1.      Lost Profit**

Plaintiffs claim that they would have earned a 12.81% profit on the Las Cruces Project. Defendants argue that this claim is "unsupported" because Plaintiffs' records show that, for all other projects in New Mexico during 2008–2010, they earned an average profit of only 2.2%. However, Plaintiffs' expert, Mr. Moehn, will testify that Plaintiffs earned profits of 11.9–19.4% for three New Mexico projects that were similar to the Las Cruces project. Thus, a reasonable jury could find that the overall average profit for all New Mexico projects, which includes many jobs of different size and character, is irrelevant.

Second, the claimed profit amount was not speculative or based on prior experience. Rather, it was built into the bid itself. Whether the bid figures were reasonable is a matter of Mr. Moehn's credibility. *See Kitchens v. Bryan Cnty. Nat'l Bank.*, 825 F.2d 248, 251 (10th Cir. 2007) ("The jury . . . has the exclusive function of appraising credibility, determining the weight to be given to the testimony, drawing inferences from the facts established, resolving conflicts in the evidence, and reaching ultimate conclusions of fact"). Summary judgment is thus not proper on Plaintiffs' damages claim for lost profits on the Las Cruces project.

    **2.      Anticipated equipment revenue**

Pulice argues that Plaintiffs have "offered no proof of [their] 'anticipated equipment revenue' figure." (Doc. 504 at 12). However, Mr. Moehn will testify about the amount of

Plaintiffs' lost equipment revenue, the manner by which that amount was calculated, and the evidence that supports the claim. Pulice challenges Mr. Moehn's methodology as insufficient to support Plaintiffs' claims. Pulice's complaints about Plaintiffs' equipment revenue damages, like its complaints about Plaintiffs' lost profits damages, really are about what weight that the jury should give Plaintiffs' evidence. Accordingly, summary judgment on Plaintiffs' equipment revenue claims is not appropriate. *See Kitchens*, 825 F.2d at 251.

**B.    Las Vegas Project**

After Plaintiffs lost the Las Cruces Project, they undertook the Las Vegas Project, purportedly in an effort to mitigate its damages. Unfortunately, Plaintiffs lost $2,374,885 on the project. Plaintiffs contend that they are entitled to recover that amount as reasonable expenses incurred while mitigating damages. In support of this contention, Plaintiffs rely on *Toledo Peoria and Western Ry. v. Metro Waste Sys., Inc*., 59 F.3d 637 (7th Cir. 1995). However, *Toledo* is unpersuasive for at least two reasons.

First, the holding in *Toledo* was specifically based on the Court's interpretation of Illinois damages law. The Court held that under Illinois law, a plaintiff who reasonably but unsuccessfully tries to mitigate damages through repairs can recover the full cost of its repairs even though such cost might exceed the fair market value at the time of damage. Neither party has addressed whether the law of New Mexico or Arizona agrees with that of Illinois. The Court finds no other case adopting or citing *Toledo* with approval. *Cf. Crompton Greaves, Ltd. v. Shippers Stevedoring Co*., 776 F. Supp. 2d 375 (S.D. Tex. 2011) (refusing to follow *Toledo* in applying Texas law on damages). Thus, it appears that *Toledo* does not govern here.

Second, the Seventh Circuit Court of Appeals remanded *Toledo* for a new trial on the issue of whether Plaintiffs' efforts to mitigate had been *reasonable*. Plaintiffs concede that if they are to recover any losses incurred in attempting to mitigate, those attempts must be reasonable. (*See* Doc. 606 at 14). Pulice argues that the undisputed facts show that Plaintiffs were not reasonable in attempting to mitigate their damages by taking on the Las Vegas project. Pulice's Undisputed Material Fact #10 reads as follows:

> 10. According to the FSG personnel responsible for the Las Vegas Project, FSG's losses on the project were the result of FSG's company inexperience in doing urban work of this type, mismanagement, delays caused by FSG personnel having "no idea" how to do the work or being inefficient at it, and delays caused by one of FSG's independent contractors. See Ex. 4, Deposition of David Olson, at 6:7-18, 7:6-10, 16:6-17:9, 146:9-147:5, Ex. 5, Deposition of Frank Lozano, at 6:6-7, 72:4-74:15, 76:6-16, 152:19-153:25, 154:9-24.

(Doc. 504 at 4). These facts are undisputed. (*See* Doc. 606 at 3). Rather than offering evidence to show that their mitigation efforts were reasonable, Plaintiffs merely argue that whether a party exercised ordinary care (including when attempting to mitigate damages) is always a jury question. *See id.* at 14. That may be the general rule. However, given the undisputed testimony, no jury could conclude that Plaintiffs' losses on the Las Vegas Project were the result of *reasonable* efforts to mitigate damages. Accordingly, Pulice is entitled to summary judgment on Plaintiffs' claim for damages related to the Las Vegas project.

C.   **Arizona Project—Incurred Cost of Borrow Material**

Plaintiffs seek damages for the loss of an opportunity to purchase "borrow material," i.e., fill dirt, close to the project site. Plaintiffs submitted the winning bid for the Arizona Project. Pulice filed a bid protest. Plaintiffs held off on purchasing the borrow material pending

7

resolution of the bid protest. Pulice's protest was eventually deemed to be untimely, and the project was re-awarded to Plaintiffs. By the time that Plaintiffs actually attempted to purchase the borrow material, they learned that Pulice had already bought it to use at a different project. Plaintiffs claim that they were forced to purchase borrow material from a site farther away from the project, which resulted in increased costs of approximately $204,000.

Pulice argues that Plaintiffs cannot recover those damages because they were "self-creat[ed]." (Doc. 504 at 14). It argues that Plaintiffs could have purchased the borrow material when the job was first awarded, but they held off because they did not want to be stuck with the material if the bid protest was upheld. Pulice argues that any loss was caused by Plaintiffs' own poor business decision, and not as a result of anything Defendants did.

But Plaintiffs have alleged that Pulice and the other Defendants conspired to, in effect, run Plaintiffs out of business in New Mexico and Arizona. (*See* Doc. 81 at 2). They allege that Pulice filed the bid protest knowing it was untimely, for the sole purpose of harming Plaintiffs. A reasonable jury could find that Pulice filed the protest knowing that Plaintiffs would delay purchasing the borrow material, and then used the extra time to snatch the borrow out from under them. Whether Pulice acted with malice, and whether Plaintiffs acted reasonably in waiting to purchase the borrow material until the bid was re-awarded, are jury questions. Pulice is not entitled to summary judgment on the claim for damages from the lost borrow source material for the Arizona Project.

D.   **Sedona Project**

Plaintiffs have withdrawn their claim for damages related to the Sedona Project. (Doc. 606 at ¶¶ 26, 30). Accordingly, summary judgment on the damages related to the Sedona Project is denied as moot.

E.   **McGuireville Project**

Plaintiffs blame Pulice for money lost on the McGuireville, Arizona Project. Plaintiffs theorize that Pulice's bid protest fostered a "toxic relationship" between Plaintiffs and ADOT. Plaintiffs argue that this toxic relationship caused ADOT to be uncooperative with Plaintiffs on the McGuireville project, which caused them to lose money on the project. Pulice responds that there is no evidence—beyond Mr. Moehn's speculation—to support Plaintiffs' position and, in fact, that all of the testimony based on first-hand knowledge attributes the McGuireville issues to Plaintiffs themselves.

On the one hand, Plaintiffs support their position with evidence from Mr. Moehn. He testified that prior to Pulice's bid protest, ADOT had been cooperative with Plaintiffs, and most issues were quickly resolved in the field. However, after Pulice's bid protest, "everything [with ADOT] was a battle." Moehn Dep. at 291:4–11, 292:7–15. Mr. Moehn appears to base his opinion on nothing more than a perceived temporal relationship between the bid protest and the deterioration of the relationship.

On the other hand, Defendants claim (and Plaintiffs do not dispute) that numerous ADOT representatives have been deposed, and none has testified that the problems on the McGuireville Project had anything to do with the alleged "poisonous relationship" between ADOT and FSG. (*See* Doc. 504 at 7, ¶ 24, and at 5–8). Undisputed Material Fact Number 24 reads:

9

> 24. ADOT personnel throughout the chain of command relevant to the Sedona II and McGuireville projects have given testimony in this case—from Project Supervisor Mark Custer, to State Construction Engineer Julio Alvarado, to Deputy State Engineer Dallas Hammit, to State Engineer Floyd Roehrick. None of these individuals, and no other witness, has given any testimony that in any way supports FSG's theory that its losses, delays, or problems on Sedona II or McGuireville were in any way related to a "toxic relationship" between ADOT and FSG. Moreover, no witness and no document supports even an inference that ADOT's handling of FSG as a contractor was in any way impacted by the fact of Pulice's bid protest, by either the First or Second Responsibility Hearing, or by any other action of any of the Defendants.

(Doc. 504 at 7, ¶ 24). The undisputed testimony shows that ADOT's own engineers (who were working with Plaintiffs on the McGuireville Project) and the State Construction Engineer (who worked with Plaintiffs on another project) discovered that Plaintiffs had intentionally falsified documents submitted to ADOT. (Doc. 504 at 6, ¶¶ 18–19; Doc. 606 at 4−5, ¶¶ 18–19). That is what triggered ADOT's investigation regarding the McGuireville project. *Id.*

Plaintiffs have offered no direct evidence to rebut these facts. Their only witness on the issue is Mr. Moehn, who testified that FGS's relationship with ADOT went downhill after Pulice's bid protest. Moehn Dep. at 291:4–11, 292:7–15. He testified that before the bid protest, Plaintiffs and ADOT had always been able to work out their differences. But afterwards, the relationship "became almost toxic, to where there was no ability to sit down and try to work through any issues." *Id.* at 291:9–11.

Plaintiff's argument rests on the *post-hoc-ergo-propter-hoc* fallacy, i.e., that because one event follows an earlier event, the earlier event must have caused the later event. Except for Mr. Moehn, everyone with first-hand knowledge of the situation has testified that ADOT's actions with respect to the McGuireville project had absolutely nothing to do with the bid protest

(or anything else the Defendants might have done). Because Mr. Moehn's testimony is pure speculation, it cannot create a genuine issue of material fact. Accordingly, Pulice is entitled to summary judgment on Plaintiffs' claim for lost monies related to the McGuireville project.

**F.     Attorney fees relating to the Arizona Project (Responsibility Hearings)**

Plaintiffs seek to recover attorney fees they incurred for two "responsibility hearings" held by the ADOT. The first arose out of Pulice's bid protest. Plaintiffs argue that the bid protest was submitted in bad faith, as part of the Defendants' conspiracy to destroy Plaintiffs' business. It is undisputed that the bid protest was untimely. Considering the circumstances of the case, a reasonable jury could find that Pulice did, in fact, file the bid protest in bad faith. A jury could find that the attorney fees were incurred in a good faith effort to mitigate damages. Accordingly, summary judgment is not warranted on Plaintiffs' claim for attorney fees related to the first responsibility hearing.

It is undisputed that the second responsibility hearing was triggered by reports from ADOT engineers that Plaintiffs had intentionally falsified documents submitted to ADOT in connection with the McGuireville Project and another project. Nevertheless, Plaintiffs attempt to argue that there would not have been a second hearing if there hadn't been a first hearing. However, Plaintiffs have no evidence to support that theory. The only evidence they have is Mr. Moehn's testimony about the allegedly "toxic relationship" between Plaintiffs and ADOT after Pulice's bid protest. Mr. Moehn speculates that, but for Pulice's bid protest, Plaintiffs and ADOT would have worked out their differences over the McGuireville project amicably and without the need for the second responsibility hearing. However, such testimony represents pure speculation by Mr. Moehn. Everyone else who was involved has testified that the second hearing

11

had nothing to do with the first. Mr. Moehn's speculation is insufficient to create a genuine issue of material fact. Accordingly, summary judgment is warranted on Plaintiffs' claim for attorney fees for the second responsibility hearing.

**THEREFORE,**

**IT IS ORDERED** that Defendants Pulice Construction Inc.'s and Stephen Basila's Motion for Partial Summary Judgment on Plaintiffs' Damages Claims (Doc. 504) is **GRANTED** as to the damages claims related to the Las Vegas Project, the McGuireville Project, and the attorney fees for the second responsibility hearing. The motion is **DENIED** as to the damages claims for the lost profits at the Las Cruces project, the lost equipment revenue at the Las Cruces project, the losses in materials costs at the Arizona project, and the attorney fees for the first responsibility hearing. The motion is **DENIED as moot** as to the losses at the Sedona project.

_____
**ROBERT C. BRACK**
**UNITED STATES DISTRICT JUDGE**